817 P.2d 1196
**STATE of New Mexico,**
**Plaintiff–Appellee,**

v.

**Richard Michael ORTEGA,**
**Defendant–Appellant.**

No. 18225.

Supreme Court of New Mexico.

Sept. 3, 1991.

Rehearing Denied Oct. 9, 1991.

Jacquelyn Robins, Chief Public Defender, Gina Maestas, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Tom Udall, Atty. Gen., Margaret B. Alcock, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

MONTGOMERY, Justice.

In this case we rekindle the debate over one of the most controversial doctrines from the common law: the felony-murder rule. The rule in New Mexico is now statutory; and defendant Ortega, convicted below of two felony murders, attacks the statute as unconstitutional. He argues that the rule establishes a presumption of *mens rea* in violation of the Due Process Clause in the fourteenth amendment to the United States Constitution. Alternatively, he argues that the rule creates a strict-liability crime in violation of an asserted due-process requirement that serious, non-regulatory crimes for which substantial punishment can be imposed contain an element of culpability, typically embodied in a *mens rea* or criminal-intent requirement. In this opinion we review the statute and the felony-murder rule against defendant's assertions of unconstitutionality; and, in light of the generally disfavored status of the rule and constitutional strictures against presumptions which may shift the burden of proof to the defendant in a criminal trial, we determine that our rule should be construed as necessitating proof of an intent to kill (which we define more fully below). We conclude that the legislature has validly determined that a killing in the course of a felony is an especially serious form of homicide, meriting punishment equal to that imposed for other forms of first degree murder.

In addition to his two felony-murder convictions, Ortega was convicted of two counts of first degree kidnapping, one count of armed robbery, one count of attempted armed robbery, and several counts of conspiracy to commit murder, kidnapping, and robbery. He was sentenced to two consecutive terms of life imprisonment for the murders and to various other concurrent and consecutive terms for the other felonies, for a total term of imprisonment of eighty-seven years.

Defendant challenges his convictions on numerous grounds apart from the challenge to the murder convictions on constitutional grounds. Most of his issues do not warrant extended analysis, although we shall consider in somewhat greater detail his attacks on the kidnapping convictions. We affirm the convictions in their entirety.

## I.

On December 30, 1987, a sheriff's deputy found the bodies of two young women near Westgate Heights in an area of Albuquerque, New Mexico, called the "West Mesa." Katherine (Kathy) Chavez, age twenty-one, and Toby Grogg, age fourteen, had died as a result of multiple stab wounds. About one month later, a grand jury indicted defendant Richard M. Ortega and his co-defendant Raymond L. Gonzales and charged them with first degree murder and several other felonies, including kidnapping (great bodily harm) and armed robbery. The State tried the two defendants separately, and Gonzales testified in Ortega's trial on behalf of the State under a grant of use and derivative use immunity.[1]

The evidence presented to the jury in Ortega's trial, viewed in the light most favorable to sustain the verdicts, established the following: Ortega and Gonzales, accompanied by Tony Casaus and other friends, went to drink beer in San Gabriel Park in Albuquerque on the afternoon of December 29, 1987, where they met Chavez and Grogg for the first time. The two girls "looked rich," because they had a brand new car and were wearing jewelry and Chavez was wearing a fur coat. Ortega told Casaus he wanted to "rob the girls and take their car." The group decided to try to obtain some cocaine, and Ortega and

---

1. Pursuant to his agreement with the State, Gonzales was tried after Ortega on one count of felony murder and one count of armed robbery. He was convicted and sentenced to life imprisonment for the murder and nine years for the robbery, the sentences to be served concurrently. His appeal from that conviction was affirmed by this Court on August 19, 1991, *State v. Gonzales,* 112 N.M. 544, 817 P.2d 1186.

Gonzales left the park with Chavez and Grogg in Chavez's new Renault, which she drove.

The foursome, along with Casaus and others in another vehicle, went first to Susan Chavez's house in Westgate Heights, where Gonzales was staying. At the house, Casaus saw Gonzales remove a knife from a kitchen drawer and place it in his poncho shortly after talking with Ortega. Gonzales and Ortega then left the house with Kathy Chavez and Grogg in the Renault to obtain some cocaine, Gonzales seated in the right rear seat behind Grogg and Ortega in the left rear seat behind Kathy, who was still driving.

Ortega first directed Chavez to drive to a nearby house, where he purportedly made arrangements for some cocaine; then he directed her to drive to a vacant lot to wait for the expected cocaine delivery. While they were parked and waiting, Ortega (according to Gonzales' testimony) suddenly reached into his sock and drew a knife, grabbed Chavez by the hair, and pulled the knife across her throat. Then, with a backhanded motion, he stabbed Grogg. As Ortega repeatedly stabbed the two girls, Gonzales (again, according to his testimony) asked Ortega what he was doing and told him he wanted nothing to do with it. Ortega pulled Chavez into the back seat, leaving blood stains on Gonzales' clothing, and then drove the Renault out of the vacant lot. Gonzales disembarked at the first opportunity and walked back to Susan Chavez's house.

A witness driving in the area of the vacant lot on the afternoon of December 29 testified he had seen the Renault leaving the area. The car was occupied by two Hispanic males; the witness identified Ortega as a passenger in the vehicle. Another witness was a neighbor who lived near the vacant lot and had observed the Renault parked in the lot on that afternoon; she testified she had seen a struggle taking place in the back seat. A man with a dark complexion moved from the back seat to the front seat, the struggle continued, and the man returned to the back seat. Then the movement in the back seat stopped and the man returned to the front seat and drove out of the lot. As the car passed her house, she observed an Hispanic male sitting in the back seat and apparently holding something down.

When Gonzales reached Susan Chavez's house, he observed Ortega making arrangements to sell the girls' jewelry in order to obtain cocaine. Kathy Chavez's car was parked in the street, and there were numerous blood stains in the car. In the days following December 29, various witnesses observed Ortega using the Renault; several of these witnesses said that the back seat appeared to be blood-stained or was covered with a sheet or a blanket. Another witness testified that Ortega came to the witness's motel on the night of December 29 with blood on his hands and clothes, and told the witness that he and another person had stabbed two girls whom they had intended to rob.

A forensic pathologist testified that Chavez had twenty-eight stab wounds on the left side of her face and neck and ten to her left breast. Her face was bruised, indicating she had been beaten; and her left hand and wrist had sustained numerous cuts and bruises, which the pathologist described as typical of defensive injuries. Grogg had forty-two stab wounds on the right side of her face, neck, and upper chest; several on the back of her neck; and three on her right upper back. She had cuts on her forearm and right hand, which were described as typical of defensive injuries. There had been an attempt to remove the ring finger on her right hand after her death. All stab wounds were consistent with the knife found at the scene and identified as belonging to Susan Chavez.

At trial, Ortega testified in his own defense. He denied participating in the murders, stating that he had been dropped off at his father's house after he, Gonzales and the two girls had left San Gabriel Park and that he had spent the night there. He and Gonzales had arranged for Gonzales to

steal the girls' car, after which Ortega was to pick it up and sell it. He testified he had in fact retrieved the car and had driven it, while making plans to sell it, until he heard about the murders. He had then abandoned the car and left for California, where he was later arrested.

At the conclusion of the guilt-determination phase of the trial,[2] the jury returned a special verdict, in which it found Ortega not guilty of the willful and deliberate murder of either Kathy Chavez or Toby Grogg, but guilty of the felony murder of each. The predicate felonies defendant was found to have committed during the murder of Chavez were kidnapping and robbery; the predicate felonies in Grogg's case were kidnapping and attempted robbery. The jury also returned verdicts of kidnapping (great bodily harm), two counts; armed robbery; attempted armed robbery; conspiracy to commit murder (willful and deliberate), two counts; conspiracy to commit kidnapping (great bodily harm), two counts; conspiracy to commit armed robbery, two counts; and conspiracy to commit robbery.

As indicated previously, Ortega challenges his convictions of felony murder on constitutional grounds. He also challenges both convictions of kidnapping on the ground that there was no evidence that he held either victim for service against her will. Additionally, he attacks his convictions of kidnapping Grogg on the basis that the kidnapping merged with the killing and on the further basis that there was no evidence that he used force to restrain Grogg against her will. Finally, he raises fifteen other asserted grounds of error, including an attack on the trial court's refusal to give any of his eight requested jury instructions.

We shall review these assertions of error in turn. We take up first the constitutionality of the New Mexico felony-murder statute.

## II.

### A.

Few legal doctrines have been as maligned and yet have shown as great a resiliency as the felony-murder rule. Criticism of the rule constitutes a lexicon of everything that scholars and jurists can find wrong with a legal doctrine: it has been described as "astonishing" and "monstrous," an unsupportable "legal fiction" [citing *State v. Harrison*, 90 N.M. 439, 442, 564 P.2d 1321, 1324 (1977)], "an unsightly wart on the skin of the criminal law," and as an "anachronistic remnant" that has " 'no logical or practical basis for existence in modern law.' "

Roth & Sundby, *The Felony–Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell L.Rev. 446, 446 (1985) (footnotes omitted) [hereinafter *Roth & Sundby*]. As indicated in this passage, dissatisfaction with the felony-murder doctrine has been widely expressed by both courts and commentators. *See generally, e.g., People v. Aaron*, 409 Mich. 672, 299 N.W.2d 304, 13 A.L.R.4th 1180 (1980) ("Some courts, recognizing the questionable wisdom of the rule, have refused to extend it beyond what is required.... The numerous modifications and restrictions placed upon the common-law felony-murder doctrine by courts and legislatures reflect dissatisfaction with the harshness and injustice of the rule."); Annotation, *Judicial Abrogation of Felony–Murder Doctrine*, 13 A.L.R.4th 1226 (1982) ("The general discomfort of the courts with felony-murder has led to the creation of many restrictions upon, or exceptions to, the doctrine, the application of which has called for so much involuted reasoning that it is difficult to discern any consistent pattern in the decisions.").

In *State v. Harrison*, we briefly reviewed the history and rationale of the

---

**2.** After the first degree murder (a capital felony) verdicts were delivered, the court conducted a separate sentencing proceeding before the original trial jury to determine whether defendant should be sentenced to death or to life imprisonment. *See* NMSA 1978, § 31–20A–1 (Repl. Pamp.1990). The jury sentenced Ortega to life imprisonment for each murder.

felony-murder rule, noting that it is codified by statute in New Mexico and that various limitations have been placed on it in different jurisdictions. 90 N.M. at 441, 564 P.2d at 1323. The statute today, which is similar to the one in effect when *Harrison* was decided, provides:

A. Murder in the first degree is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused: * * *

(2) in the commission of or attempt to commit any felony * * *.

NMSA 1978, § 30–2–1(A)(2) (Repl.Pamp. 1984).

We noted in *Harrison:*

Our felony murder statute conclusively presumes that any homicide occurring during any felony is first-degree murder. But the *mens rea* of first-degree murder requires malice aforethought or a greatly dangerous act without regard to human life. To presume conclusively that one who commits *any* felony has the requisite *mens rea* to commit first-degree murder is a legal fiction we no longer can support. In felony murder cases where the felony is a first-degree felony such a presumption is appropriate, but not where the felony is of a lesser degree.

90 N.M. at 442, 564 P.2d at 1324 (emphasis in original). We went on to impose the requirement that, to charge felony murder for a killing in the commission of or attempt to commit a felony, the felony must be either a first degree felony (in which case the *"res gestae"* test must be used) or the lesser degree felony must be inherently dangerous or committed under circumstances that are inherently dangerous. *Id.*

In *State v. Price,* 104 N.M. 703, 726 P.2d 857 (Ct.App.), *cert. quashed,* 104 N.M. 702, 726 P.2d 856 (1986), our court of appeals joined in recognizing that the felony-murder doctrine is disfavored. Holding that the crime of attempted felony murder is not recognized in New Mexico, the court

criticized the doctrine as "result-oriented" and unpopular because of "the legal presumption that a defendant intended to kill." *Id.* at 705, 726 P.2d at 859. Although "[c]ourts, commentators, and legislatures alike adhere to the belief that the prosecution should bear the burden of proving that the defendant possessed the necessary [malice] aforethought or *mens rea* [,]" *id.,* "the determination of whether felony murder has been properly charged does not turn on whether the murder was intentionally or unintentionally committed; felony murder simply contains no *mens rea* requirement." *Id.* at 704, 726 P.2d at 858.

Relying in part on the *Roth & Sundby* article, defendant Ortega argues that the deficiencies of the felony-murder rule have constitutional dimensions. He bases his argument chiefly on the United States Supreme Court decision in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). There the Court held that a jury instruction that a person is presumed to intend the ordinary consequences of his voluntary acts violates the due-process requirement that the state must prove every element of a criminal offense beyond a reasonable doubt. Writing for a unanimous Court, Justice Brennan relied on *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), for the proposition that the Due Process Clause requires proof beyond a reasonable doubt of every fact necessary to constitute the crime with which an accused is charged. 442 U.S. at 520, 99 S.Ct. at 2457. The Court then drew on *Morissette v. United States,* 342 U.S. 246, 274, 72 S.Ct. 240, 255, 96 L.Ed. 288 (1952), dealing with conclusive presumptions; *United States v. United States Gypsum Co.,* 438 U.S. 422, 435–36, 98 S.Ct. 2864, 2872–73, 57 L.Ed.2d 854 (1978), which reaffirmed *Morissette;* and *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), dealing with burden-of-persuasion-shifting presumptions, to invalidate presumptions that invaded the jury's fact-finding function and shifted the burden of proof from the state to the defendant. 442 U.S. at

521–24, 99 S.Ct. at 2458–59. Both of these effects were held to have violated the defendant's right to due process of law.[3]

According to *Roth & Sundby* at 469, "*Sandstrom* casts serious doubt upon the constitutionality of the transferred intent-constructive malice theory of the felony-murder rule * * * [which] irrebuttably imputes the mens rea required for the homicide from that necessary for the felony." In light of our statements in *Harrison*, it is easy to see how the rule might operate in this fashion. We said: "In felony murder cases where the felony is a first-degree felony such a presumption [that one who commits a felony has the requisite *mens rea* to commit first degree murder] is appropriate, but not where the felony is of a lesser degree." 90 N.M. at 442, 564 P.2d at 1324. It is now open to serious question whether, even where the felony is a first degree felony or an inherently dangerous one of a lesser degree, *any* presumption— either a conclusive presumption or a burden-shifting presumption—is constitutional, where the effect of the presumption is to establish, or place on the defendant the burden of disproving, that he or she had the requisite *mens rea* to commit first degree murder.

It may be argued, in reliance on *State v. Price* and a recent decision of this Court, *State v. Pierce*, 109 N.M. 596, 788 P.2d 352 (1990), that felony murder is a strict-liability crime for which *mens rea* is not required. In *Pierce*, we quoted with approval from *Price* that in felony murder " 'the requisite malice aforethought can be inferred from the commission or attempted commission of the felony * * *. [F]elony murder simply contains no *mens rea* requirement.' " *Id.* at 601, 788 P.2d at 357 (quoting 104 N.M. at 704, 726 P.2d at 858).[4] If these statements are indeed correct, then Ortega's claim that felony murder is a strict-liability crime in New Mexico may be well taken. However, as developed below, we now believe that these statements in *Pierce* and *Price* were ill-advised and that, for reasons we shall explain, felony murder *does* have a *mens rea* element, which cannot be presumed simply from the commission or attempted commission of a felony.

Proceeding from the premise that felony murder is a strict-liability crime in New Mexico, Ortega argues that the statute defining the offense is unconstitutional as imposing cruel and unusual punishment in violation of the eighth amendment to the Constitution and as violating due process by prescribing serious punishment for a crime in which the traditional requirement of a culpable state of mind is lacking. He

---

**3.** Six years after *Sandstrom,* in another opinion by Justice Brennan, the Court made clear that the unconstitutionality of a conclusive presumption, as established in *Sandstrom,* extends to a rebuttable presumption which a reasonable juror might understand as shifting to the defendant the burden of persuasion on an essential element of the offense. *Francis v. Franklin,* 471 U.S. 307, 315–18, 105 S.Ct. 1965, 1971–73, 85 L.Ed.2d 344 (1985) (reaffirming *Mullaney*). Very recently, the Court reconfirmed the vitality of both *Sandstrom* and *Francis* in *Yates v. Evatt,* — U.S. —, —, 111 S.Ct. 1884, 1891, 114 L.Ed.2d 432 (1991).

In another, equally recent decision, the Supreme Court held that a first degree murder conviction was not unconstitutional where the jury, while required to find unanimously that defendant was guilty of first degree murder, was not required to be unanimous in finding either premeditation or felony murder. *Schad v. Arizona,* — U.S. —, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). The constitutional issue discussed in this opinion—whether the felony-murder rule violates *Sandstrom*—was not discussed in either Justice Souter's four-Justice plurality, Justice White's four-Justice dissent, or Justice Scalia's opinion concurring in the judgment.

**4.** Although *Price* and *Pierce* used the word "inferred," we do not believe the opinions meant to distinguish between a permissible *inference* and the required *presumption;* in context, we read the word "inferred" as synonymous with "presumed." Nothing in the present opinion is intended to prevent the fact finder from using the circumstances of the underlying felony—particularly where the felony is "inherently dangerous," as *Harrison* requires in many cases—as the basis for an inference that the killer possessed the requisite intent to kill (or other culpable mental state, as discussed in this opinion). *See People v. Aaron,* 409 Mich. at 729–30, 299 N.W.2d at 326–27 (whenever killing occurs in perpetration or attempted perpetration of inherently dangerous felony, jury may consider nature of underlying felony and circumstances surrounding its commission to infer malice).

562

bases his eighth amendment argument on *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), in which the Supreme Court held that the death penalty, imposed on one convicted of felony murder who neither takes life, attempts to take life, nor intends to take life, is cruel and unusual punishment. Ortega derives his due-process argument from *Morissette* and from *United States Gypsum Co.* In the latter two cases, the Court held that the federal crimes of, respectively, converting government property and price-fixing in violation of the Sherman Act required proof of criminal intent. Neither case held (and no other case of which we are aware has held) that a *mens rea* element of culpability is required for non-regulatory crimes as a matter of federal constitutional law, but both cases relied heavily on the traditional notion of subjective culpability to construe the statutes in those cases as requiring criminal intent. *Gypsum* quoted this well-known passage from *Morissette:*

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory 'But I didn't mean to,' and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

*Gypsum,* 438 U.S. at 436, 98 S.Ct. at 2873 (quoting 342 U.S. at 250–51, 72 S.Ct. at 243–44 (opinion of Jackson, J.)).

### B.

◼ We follow the lead of the United States Supreme Court in construing our statute on felony murder—a statute which at most is silent on the necessity of an intent-to-kill element, and certainly does not expressly negate any such requirement—as requiring proof that the defendant intended to kill (or had the state of mind otherwise generally associated with *mens rea*). We adopt this construction for three reasons. The first is the general presumption in our Anglo–American jurisprudence that, for the reasons summed up by Justice Jackson in *Morissette,* serious, non-regulatory crimes are generally attended by moral culpability arising from or manifested in a mental state generally characterized as "an evil mind." Strict-liability crimes, in other words and as *Gypsum* says, constitute an exception to the rule that "intent generally [is] an indispensable element of a criminal offense." 438 U.S. at 437, 98 S.Ct. at 2873.

Our second reason for construing the felony-murder statute as contemplating proof of an intent to kill follows from the first. If one responds to the proposition that a serious, non-regulatory crime generally requires criminal intent by saying (as *Harrison* and *Pierce* appear to have said) that the requisite intent is supplied by the intention to commit the felony and that proof of the felony (especially, under *Harrison,* a first degree or other inherently dangerous felony) gives rise to a presumption of the necessary intent, one runs headlong into *Sandstrom.* Under *Sandstrom,* any presumption which establishes a fact essential for conviction of the crime by proof of another fact, or which shifts to the defendant the burden of persuasion that the essential fact is not true, runs afoul of the Due Process Clause by conflicting with " *'the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime.'* " *Sandstrom,* 442 U.S. at 522, 99 S.Ct. at 2458 (quoting *Morissette,* 342 U.S. at 274–75, 72 S.Ct. at 255) (emphasis in original). It goes without saying that we should construe our statutes to avoid a holding that the statute is unconstitutional. *See Huey v. Lente,* 85 N.M. 597, 598, 514 P.2d 1093, 1094 (1973). Construing Section 30–2–1(A)(2) as requiring proof that the

defendant intended to kill the victim (or was knowingly heedless that his or her acts created a strong probability of death or great bodily harm) removes the statute from this threat of unconstitutionality.

■ Under the statute as so construed, proof that a killing occurred during the commission or attempted commission of a felony will no longer suffice to establish murder in the first degree. In addition to proof that the defendant *caused* (or aided and abetted) the killing, *see Harrison*, 90 N.M. at 441–42, 564 P.2d at 1323–24 ("causation consists of those acts of defendant or his accomplice initiating and leading to the homicide"), there must be proof that the defendant *intended* to kill (or was knowingly heedless that death might result from his conduct). An unintentional or accidental killing will not suffice. The intent to kill need not be a "willful, deliberate and premeditated" intent as contemplated by the definition of first degree murder in Subsection 30–2–1(A)(1), nor need the act be "greatly dangerous to the lives of others, indicating a depraved mind regardless of human life," as contemplated by the definition in Subsection (A)(3). Indeed, an intent to kill in the form of knowledge that the defendant's acts "create a strong probability of death or great bodily harm" to the victim or another, so that the killing would be only second degree murder under Section 30–2–1(B) if no felony were involved, is sufficient to constitute murder in the first degree when a felony *is* involved—or so the legislature has determined. Second degree murder, in other words, may be elevated to first degree murder when it occurs in circumstances that the legislature has determined are so serious as to merit increased punishment; but both types of killing—felony (first degree) murder and second degree murder—necessitate a culpable state of mind, ordinarily described in legal parlance as a *mens rea*.

■ Admittedly, what we have just said is to some extent inconsistent with some of our earlier statements in *Harrison* and *Pierce* and with some of the court of appeals' statements in *Price*. To the extent the opinions in those cases contain statements at variance with those we adopt today, we find it necessary to modify them to bring them into conformity with this decision. However, the holdings in the cases remain intact. The holding in *Harrison* was that felony murder must be predicated on a first degree or other inherently dangerous felony. We believe this interpretation of the statute remains appropriate, since the purpose of elevating what would otherwise be second degree murders to first degree murders is to single out those especially serious killings that warrant the law's most serious forms of punishment. Killings in the commission of lesser-degree felonies or those not inherently dangerous or committed under circumstances that are inherently dangerous do not fall within this purpose.

Similarly, the holding in *Price* is not necessarily affected by what we decide today. The court of appeals assigned several reasons for its conclusion that the "crime" of attempted felony murder should not be recognized; the premise that felony murder contains no *mens rea* element was only one of a number of reasons advanced to support the conclusion. The issue, obviously, is not before us today.

As for *Pierce*—which the State contends reaffirmed the classical formulation of felony murder as containing no *mens rea* requirement—we note that the jury in that case returned an undifferentiated verdict of first degree murder. Unlike the jury in the present case, the jury in *Pierce* did not find the defendant not guilty of willful and deliberate murder and guilty only of the alternative, felony murder. The jury there was instructed, as was the jury in the instant case, on the elements of first degree murder of both the "willful and deliberate" kind (under Uniform Jury Instruction–

Criminal (UJI Crim.) 201 [5]) and the "felony murder" variety (UJI Crim. 202). As the court noted, the victim was strangled and allowed to bleed to death after the defendant kidnapped her. 109 N.M. at 601, 788 P.2d at 357. Moreover, no issue was raised in *Pierce* as to the constitutionality, under *Sandstrom v. Montana* or any other case, of the conclusive presumption entailed by the felony-murder rule.

Our third reason for construing the felony-murder statute as containing an intent requirement lies in the structure and wording of the provisions of our Criminal Code on homicide. Article 2 of Chapter 30 of our compiled statutes, in addition to containing various sections dealing with excusable homicide, justifiable homicide, and other matters, basically defines homicide as consisting of two categories—murder (consisting of first degree murder and second degree murder, Section 30–2–1) and manslaughter (consisting of voluntary manslaughter and involuntary manslaughter, Section 30–2–3). Murder in the first degree is defined as an unjustified killing "by any kind of willful, deliberate and premeditated [act]" (Section 30–2–1(A)(1)); "in the commission of or attempt to commit any felony" (Section 30–2–1(A)(2)); or "by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life" (Section 30–2–1(A)(3)).[6] Second degree murder is defined as an unjustified killing where the killer knows that the acts causing the death create a strong probability of death or great bodily harm to the victim or another. Section 30–2–1(B).[7] Manslaughter is defined as an unlawful killing "without malice." Voluntary manslaughter consists of manslaughter committed upon a sudden quarrel or in the heat of passion, and involuntary manslaughter consists of manslaughter committed in the commission of an unlawful act not amounting to a felony or in the commission of a lawful act which might produce death, in an unlawful manner and without due caution and circumspection. Section 30–2–3.[8]

Thus, the basic difference between murder in either the first or second degree and manslaughter, either voluntary or involuntary, is that manslaughter does not involve "malice."

As noted above, the statute defining murder in effect when *Harrison* was decided provided, consistent with the common-law definition of murder, that the crime consisted of an unlawful killing "with malice aforethought." "Malice" was defined by statute as the deliberate intention to take the life of another or, if "considerable provocation" was absent, when all circumstances showed a "wicked and malignant heart." NMSA 1978, §§ 30–2–1, 30–2–2 (Orig.Pamp.). In 1980, the statute was amended to delete the requirement of malice aforethought and to repeal the definitions of malice. N.M.Laws 1980, ch. 21, §§ 1, 2. Although one noted authority on the New Mexico law of homicide believes that leaving the term "without malice" in the definition of manslaughter may have been a legislative drafting oversight, Romero, *Unintentional Homicides Caused by Risk–Creating Conduct: Problems in Distinguishing Between Depraved Mind Murder, Second Degree Murder, Involuntary Manslaughter, and Noncriminal Homicide in New Mexico*, 20 N.M.L.Rev. 55, 69 (1990), we need not necessarily regard it as such and it may in fact have been intentional. In any event, our duty is to construe the statute as written,

---

5. SCRA 1986, 14–201.

6. The penalty for murder in the first degree is death or life imprisonment. NMSA 1978, § 31–18–14 (Repl.Pamp.1990).

7. The penalty for second degree murder is nine years imprisonment and a fine not to exceed $10,000. Subsections 31–18–15(A)(2) and 31–18–15(D)(2).

8. The penalties are three years imprisonment for voluntary manslaughter and eighteen months for involuntary manslaughter, plus in each case a fine of up to $5,000. Subsections 31–18–15(A)(3) & (4), 31–18–15(D)(3).

and we find at least some significance in the phrase "without malice" in the definition of manslaughter.

According to a leading treatise on criminal law, the term "aforethought" has come to be superfluous, since the requisite state of mind need exist only at the time the homicidal act is committed, and the phrase "malice aforethought" has become a mere symbol denoting various mental states. II C.E. Torcia, *Wharton's Criminal Law* § 137, at 169–71 (14th ed. 1979). Among the mental states so denoted are intent to kill, intent to cause great bodily harm, intent to do an act knowing that it will probably cause death or great bodily harm, and intent to commit an act imminently dangerous to others and evincing a depraved and malignant heart regardless of human life. *Id.* at 170–71. So it is not surprising that in 1980 our legislature removed the term "malice aforethought" from the definition of murder, repealed the archaic definitions of "express" and "implied" malice, and substituted more descriptive terms for the states of mind contemplated by the statute defining first and second degree murder. In both cases, however—that is, for both first degree and second degree murder—the "specific intent" set forth in the statute is an element of the crime. *See State v. Doe,* 100 N.M. 481, 484, 672 P.2d 654, 657 (1983).[9] We thus conclude that the "malice" required for murder (both first and second degree), as opposed to manslaughter, is an intent to kill or an intent to do an act greatly dangerous to the lives of others or with knowledge that the act creates a strong probability of death or great bodily harm. We believe the same intent should be required to invest with first degree murder status a killing in the commission of or attempt to commit a first degree or other inherently dangerous felony.[10]

As so construed, we think that in our felony-murder statute the legislature has permissibly determined that a killing in the commission or attempted commission of a felony is deserving of more serious punishment than other killings in which the killer's mental state might be similar but the circumstances of the killing are not as grave. The statute thus elevates to first-degree murder status a killing (with the requisite criminal intent) in the commission or attempted commission of a felony. Although the *mens rea* of the killer may not be as culpable as that of other first degree murderers (*i.e.,* those whose killing has been "willful, deliberate and premeditated" or who have committed "an act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life"), the circumstances under which the killing has taken place are deemed especially worthy of condemnation and as justifying the law's most serious forms of punishment. In this respect, we regard our statute as similar to those in the cases cited in footnote 10, *supra,* which have been construed as having the purpose of raising to the first-degree level murders committed with the requisite malice aforethought. *See also Commonwealth ex rel. Smith v. Myers,* 438 Pa. 218, 224, 261 A.2d 550, 553 (1970) ("Clearly this statutory felony-murder rule merely serves to raise the degree of certain murders to first degree; it gives no aid to the determination of what constitutes murder in the first place.").

In *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), the Supreme Court said:

> *[O]ne could argue* without fear of contradiction by any decision of this Court that for crimes concededly classified and

**9.** The term "specific intent" in *Doe* should have been "specific knowledge"; second degree murder is not a "specific intent" crime. *State v. Beach,* 102 N.M. 642, 644–45, 699 P.2d 115, 117–18 (1985). Nor by anything said in this opinion do we mean to imply that felony murder is now a "specific intent" crime.

**10.** Other states have similarly held that to charge or convict a person with first degree

murder under those states' felony-murder (or other comparable) statutes, an intent to kill (or another state of mind similar to what we have defined as "malice") is required. *See, e.g., State v. Galloway,* 275 N.W.2d 736, 738 (Iowa 1979); *People v. Aaron,* 409 Mich. at 728, 299 N.W.2d at 326; *State v. Millette,* 112 N.H. 458, 462, 299 A.2d 150, 153 (1972).

classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative. *Id.* at 274, 100 S.Ct. at 1139 (emphasis added; footnote omitted) (quoted in part in *State v. Archibeque,* 95 N.M. 411, 412, 622 P.2d 1031, 1032 (1981)). However, in *Solem v. Helm,* 463 U.S. 277, 288 n. 14, 103 S.Ct. 3001, 3009 n. 14, 77 L.Ed.2d 637 (1983), the Court rejected as "meritless" any such argument if advanced to invalidate under the eighth amendment a life sentence without possibility of parole for a seventh nonviolent felony (in that case, issuing a "no-account" check for $100). Thus, under current eighth-amendment jurisprudence, a lengthy sentence of imprisonment, no less than the death penalty, can be scrutinized for disproportionality and possibly held unconstitutional as cruel and unusual punishment. *Solem,* however, reaffirmed the "broad authority that legislatures necessarily possess in determining the types and limits of punishment for crimes," 463 U.S. at 290, 103 S.Ct. at 3009; and that authority is not really challenged in this case, except for the claim that treating felony murder as a strict-liability offense, lacking a *mens rea* element, would violate the eighth amendment. We have held that felony murder is not such a strict-liability crime; and it is difficult to see how the legislature's broad authority to prescribe life imprisonment for it, even under the sweeping standards of *Solem v. Helm,* could be seriously questioned, at least in a case with facts like those present here. In any event, no such argument is made in this case.[11]

■ We hold, therefore, that our felony-murder statute, requiring as it does both causation attributable to the defendant (who may be acting through an accomplice) and an intent to kill (or to do an act greatly dangerous to the lives of others or with knowledge that the act creates a strong probability of death or great bodily harm), is a valid exercise of the legislature's authority to prescribe serious punishment for killings committed with the requisite criminal intent and that occur during the commission or attempted commission of a first degree or other inherently dangerous felony.

## C.

■ The jury in Ortega's trial was not instructed that it had to find criminal intent (as we have defined it) associated with the killing of each victim in order to convict Ortega of the felony murder of each. Under some of our cases, this absence of an instruction on an essential element for conviction of a crime could be deemed fundamental error, which, even if not preserved in the trial court or raised as an issue on appeal,[12] could be raised by this Court on our own motion as a basis for reversal. *See Jackson v. State,* 100 N.M. 487, 489, 672 P.2d 660, 662 (1983). The doctrine of fundamental error, however, will be invoked by an appellate court only when the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or when the court considers it necessary to avoid a miscarriage of justice. *See State v. Osborne,* 111 N.M. 654, 662, 808 P.2d 624, 632 (1991). Here, we not only have confidence in the jury's verdict (guilty on two counts of felony murder); we think it would be a miscarriage of justice to upset the verdicts and remand for

11. As we have seen, the Supreme Court, in *Enmund v. Florida,* did invalidate under the eighth amendment a sentence of death for a felony murder, where the defendant did not intend to take life. *See also Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (major participation in underlying felony, combined with reckless indifference to human life, sufficient to satisfy *Enmund* culpability requirement for death sentence for felony murder) (5–to–4 decision). The present case presents no issue as

to the constitutionality of the death penalty for a felony murder, and we express no opinion on that issue.

12. Defendant did not request an instruction below on the necessity for intent as an element of felony murder, nor does he raise on appeal the absence of such an instruction as a ground for reversal.

a new trial, the outcome of which most assuredly would be the same.

■ As previously noted, the jury found Ortega not guilty of willful and deliberate murder, but guilty of felony murder based on the underlying felonies of kidnapping and robbery (in Chavez's case) and kidnapping and attempted robbery (in Grogg's case). In light of the evidence, it is relatively easy to see why the jury reached this result. The jury was instructed, first, on the elements of willful and deliberate murder as set out in UJI Crim. 14–201. This instruction tells the jury that it must find that the defendant killed the victim and that the killing was with the deliberate intention to take away the life of the victim. The instruction continues:

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

SCRA 1986, 14–201.[13]

Given Gonzales' testimony that Ortega suddenly reached into his sock and withdrew a knife, slashing Chavez's throat and stabbing Grogg, the jury might have been unsure about whether Ortega had given "careful thought" to his proposed course of action, had weighed the considerations for and against that course, and had considered his reasons for and against the choice. But the jury was also instructed on second degree murder, in accordance with UJI Crim. 14–211, as a lesser included offense within first degree murder. This instruction required only that the jury find Ortega killed the victim and knew that his acts created a strong probability of death or great bodily harm to her. The jury might well have been certain that Ortega was guilty of at least second degree murder.

The instruction on felony murder read in its entirety, as specified in UJI Crim. 14–202:

For you to find the defendant guilty of felony murder, which is first degree murder, as charged in the Alternative to Count 1 [or 2], the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The defendant committed the crimes of kidnapping and/or robbery [or attempted robbery] under circumstances or in a manner dangerous to human life;

2. During the commission of the crimes of kidnapping and/or robbery [or attempted robbery] the defendant caused the death of Katherine Chavez [or Toby Grogg];

3. This happened in New Mexico on or about the 29th day of December, 1987.

It will be noted that under this instruction the jury had to find, in order to convict Ortega of felony murder, that he *caused* the death of the victim.

In light of this instruction, even though the jury was instructed under UJI Crim. 14–250 to decide about first degree murder before deliberating on second degree murder, it easily could have concluded that Ortega killed either or both Chavez and

**13.** We approved this instruction in *State v. Hamilton,* 89 N.M. 746, 750–51, 557 P.2d 1095, 1099–1100 (1976). Even though thus approved, we have some reservations about the elaborations in the instruction—"careful thought," "consideration for and against," "weigh[ing] and consider[ing] the question of killing and [the] reasons for and against" the choice—of the statutory phrase, "willful, deliberate and premeditated."

Grogg and knew that his acts created a strong probability of death or great bodily harm to each of them, and that he caused their deaths during the commission of the crimes of kidnapping and/or robbery or attempted robbery. Having so concluded, the resulting verdict, guilty of first degree murder, would have been entirely proper.

An alternative, and perhaps more plausible, scenario of the jury's deliberations is that they believed that either Ortega or Gonzales killed Chavez and Grogg, but were uncertain as to who actually stabbed whom. The physical configuration of the occupants of the Renault on the afternoon of December 29—Ortega seated behind Chavez and Gonzales seated behind Grogg—and the location of the stab wounds on the victims' bodies—primarily on Chavez's left side and primarily on Grogg's right—were consistent with the theory that Ortega stabbed Chavez and Gonzales stabbed Grogg. The struggle in the car, which may have lasted several minutes, and Gonzales' actions afterward may well have led the jury to discredit Gonzales' testimony that he had no part in the killings. The jury found Ortega guilty of conspiracy to commit the willful and deliberate murder of both Chavez and Grogg, and the court's instructions required them to convict for this offense (which was charged in two counts—one for Chavez, one for Grogg) only if they found that Ortega and Gonzales agreed together to commit the willful and deliberate murder of each victim and intended to commit that murder.

So, having determined that Ortega committed the crimes of kidnapping and/or robbery or attempted robbery, the question was whether, during the commission of those crimes, he "caused" the death of either Chavez or Grogg, if the stabbing was actually perpetrated by Gonzales.

The court instructed the jury on the criminal liability of an accessory under NMSA 1978, Section 30–1–13 (Repl.Pamp.1984),[14] in accordance with UJI Crim. 14–2822, which permits a defendant to be found guilty, even though he himself did not do the acts constituting the crime, if he helped, encouraged, or caused the crime to be committed. However, the instruction does not apply to a charge of felony murder; for such a charge the jury is to be instructed under UJI Crim. 14–2821. Ortega's jury was so instructed by the court's Instruction No. 8, which read in its entirety:

The defendant may be found guilty of felony murder as charged in the alternatives to Counts 1 and 2, even though he himself did not commit the Kidnapping, Robbery of Katherine Chavez, or Attempted Robbery of Toby Grogg, if the state proves to your satisfaction beyond a reasonable doubt that:

1. During the commission of any of the above crimes, under circumstances or in a manner dangerous to human life, someone caused the death of Katherine Chavez and/or Toby Grogg;

2. The defendant helped, encouraged or caused the crime to be committed;

3. The defendant intended that the crime be committed;

4. This happened in New Mexico on or about the 29th day of December, 1987.

This instruction has several shortcomings which, in another case, might be fatal to a conviction. First, it is not enough for "someone" to cause the death of the victim; it is necessary that the *defendant* cause the death, either through his own acts or through the acts of an accomplice whom the defendant helps, encourages or "causes" to commit the crime, and only if the defendant intends the crime to be committed. In the present case, however, the

14. This statute provides: "A person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission and although he did not directly commit the crime and although the principal who directly committed such crime has not been prosecuted or convicted, or has been convicted of a different crime or degree of crime, or has been acquitted, or is a child under the Children's Code[.]"

"someone" who might have caused the death of either victim could only have been Raymond Gonzales, and the jury found that Ortega not only intended the death of each victim but by words or acts agreed with Gonzales to commit the willful and deliberate murder of the victims. On these facts, therefore, and in light of the jury's other findings, we do not invoke the doctrine of fundamental error to set aside Ortega's convictions based on the deficiencies in Instruction No. 8.[15]

Second, the instruction does not expressly require the jury to find that the defendant had criminal intent (as we have defined it) *with respect to the killing*, as opposed to intent with respect to the felony. The committee commentary to UJI Crim. 14–2821 states that the instruction is considerably different from UJI Crim. 14–2822, "because under that instruction the defendant must have intended the crime that was committed, and in this instruction on felony murder, the defendant need only intend that the underlying felony be committed." As we have held in this opinion, this point is no longer correct as a matter of New Mexico law, so UJI Crim. 14–2821 will have to be amended accordingly.

Third, the requirement that "the defendant helped, encouraged or caused the crime to be committed" refers, by use of the phrase "the crime," to the underlying felony; it does not expressly deal with the situation in which the defendant has helped, encouraged or caused (through the accomplice) the killing to be committed. Here again, UJI Crim. 14–2821 should be revised.

Notwithstanding these theoretical defects, however, we think the validity of Ortega's convictions of the felony murders of Katherine Chavez and Toby Grogg was not impaired. The jury found, in the light of competent evidence and under instructions that adequately informed it of the governing law, that defendant Ortega caused the death of Chavez and Grogg, either through his own acts or through those of an accomplice whom he helped and encouraged, and with the intent to commit the killings or with knowledge that there was a strong probability of death or great bodily harm to each victim. Under those circumstances, the felony-murder verdicts should be affirmed.

### III.

We address more briefly Ortega's challenges to his convictions for kidnapping. He contends, first, that there was no evidence that he held the victims to service against their will, as is required by our kidnapping statute, NMSA 1978, Section 30–4–1(A) (Repl.Pamp.1984).[16] He contends additionally that, in the case of Grogg, there was no evidence that he used force to restrain her and that, if there was, any force was identical to the force used to kill her, so that the kidnapping and murder convictions merge. We find these contentions to be largely without merit, although the question whether Grogg was held for service requires us to construe that term as it is used in the kidnapping statute.

### A.

The statute does not define the phrase "held to service," and no New Mexico case appears to have attempted a definition either. The uniform jury instructions are not particularly helpful on this point; the instruction on the elements of the crime, which was given in this case, requires simply that the state prove that the defendant intended to "hold [the victim] for service against her will." UJI Crim. 14–

---

**15.** Ortega did not object below to Instruction No. 8, except to argue "that one cannot aid and abet one's self if they're a principal," which did not alert the court to the deficiencies described in the text.

**16.** The statute reads: "Kidnaping is the unlawful taking, restraining or confining of a person, by force or deception, with intent that the victim: (1) be held for ransom; (2) as a hostage, confined against his will; or (3) be held to service against the victim's will."

404. The instruction purporting to define the phrase provides only: " 'Hold for service' includes holding for sexual purposes." UJI Crim. 14–405. There was no evidence that the victims were sexually assaulted or molested, so UJI Crim. 14–405 was not given.

In *State v. Aguirre*, 84 N.M. 376, 503 P.2d 1154 (1972), we rejected a contention that "held to service against the victim's will" has no general meaning which the public can comprehend. We said: "None of the words contained in the said clause is unusual or difficult of definition or understanding. A reference to any standard dictionary readily reveals that each of these words has a common meaning, and we cannot agree that their combination in the order shown conveys an unusual meaning which the public cannot comprehend." *Id.* at 381–82, 503 P.2d at 1159–60. Taking our cue from *Aguirre*, we find in *Webster's Third New International Dictionary* 2075 (1961) a definition of "service" which includes these meanings: "an act done for the benefit or at the command of another"; "action or use that furthers some end or purpose: conduct or performance that assists or benefits someone or something: deeds useful or instrumental toward some object." A legal dictionary defines the word as including "[d]uty or labor to be rendered by one person to another, the former being bound to submit his will to the direction and control of the latter." *Black's Law Dictionary* 1368 (6th ed. 1990).

Another useful authority in this connection is the court of appeals' decision in *State v. Fish*, 102 N.M. 775, 701 P.2d 374 (Ct.App.), *cert. denied*, 102 N.M. 734, 700 P.2d 197 (1985). There the defendant transported the victim to a bank for the purpose of causing the victim to operate her automatic teller card and withdraw money which he then took from her. The jury (apparently unaware of this Court's ruling in *Aguirre* that "held to service" has a commonly understood meaning) sent a note to the court during its deliberations,

asking "What else does 'hold ... for service' include in kidnapping other than for sexual [purposes?]" *Id.* 102 N.M. at 781, 701 P.2d at 380. The trial court responded: "A general definition of holding for service is simply being made to submit your will to the direction and control of another for the purpose of performing some act." *Id.* The court of appeals held that the giving of this instruction, while unnecessary, was not error, noting that the instruction does not cover the definition for types of cases other than those where the victim is held for sexual purposes. *Id.*

We think the trial court's instruction in *Fish* was adequate, though perhaps it can be improved somewhat. The instruction conveys the notion that one is held to service when he or she is made to submit his or her will to the direction and control of another. The purpose of being so compelled or induced—"for the purpose of performing some act"—probably could be better stated; for example, using *Webster's:* "for the purpose of assisting or benefiting someone or something." Such an explanation serves to distinguish kidnapping from false imprisonment, which is a lesser offense included within kidnapping. *Id.* at 779, 701 P.2d at 378. False imprisonment consists only of intentionally confining or restraining another person, with knowledge of lack of authority to do so and without the latter's consent, § 30–4–3, whereas kidnapping consists of restraining or confining a person to achieve some end or secure some benefit: to hold the victim for ransom, to confine the victim as a hostage, or to hold the victim for service against the victim's will, § 30–4–1(A). The third objective mentioned in the statute, holding for service, should be construed to effectuate the same overall scheme as the first two objectives, holding for ransom and as a hostage—namely, to accomplish some goal that the perpetrator may view as beneficial to himself or herself. The uniform jury instruction should be revised to provide this type of explanation of the statutory phrase.

█ In the present case, we have no difficulty concluding that both Chavez and

Grogg were held for service to benefit Ortega; both victims were induced, by deception, to accompany Ortega to a remote location as part of an overall plan. Chavez's "service" is easy to identify: She voluntarily drove to the isolated lot, at Ortega's direction, under the deception that they were going there to purchase cocaine. Although Grogg did not drive, her presence benefitted Ortega and Gonzales almost as much as Chavez's; certainly any refusal on her part to accompany them would have complicated their plan and thwarted their effort to transport the girls to a remote spot. It would be artificial to distinguish the service provided by Chavez from that afforded by Grogg; both accompanied the conspirators and both were deceived into assisting them in carrying out their objective.

We hold that the jury could properly find that Grogg, no less than Chavez, was held to service against her will.

### B.

Ortega next contends that the convictions for Grogg's kidnapping and murder should be deemed to merge: "When facts used to establish the elements of two separate offenses are identical, imposition of multiple punishment for violation of two separate statutes is problematic under existing New Mexico case law." He cites *State v. McGuire,* 110 N.M. 304, 795 P.2d 996 (1990), and *State v. Tsethlikai,* 109 N.M. 371, 785 P.2d 282 (Ct.App.1989), *cert. denied,* 109 N.M. 262, 784 P.2d 1005 (1990), *inter alia,* as support for this proposition.

■ We recently reviewed the law on merger of offenses for multiple punishment purposes in *Swafford v. State,* 112 N.M. 3, 810 P.2d 1223 (1991). We held that the "merger" inquiry involves a two-part test: "whether the conduct underlying the offenses is unitary, *i.e.,* whether the same conduct violates both statutes"; and "whether the legislature intended to create separately punishable offenses." *Id.* at 3, 810 P.2d at 1233.

■ Application of this test in this case is straightforward. Contrary to Ortega's contention, the facts used to establish the elements of the two separate offenses, kidnapping and murder, were not identical— that is, the conduct underlying the offenses was not unitary. Defendant focuses on Gonzales' testimony that, after slashing Chavez's throat, Ortega reached across and stabbed Grogg, whereupon she slumped against the door. From this he argues that Grogg was killed and forcibly restrained by the same act. This argument ignores the evidence that some of Grogg's forty-two stab wounds were typical of defensive injuries, so that the jury could infer that Grogg, instead of dying immediately, fought off her attacker and was "restrained" while doing so. Defendant's argument also ignores the fact that Grogg's kidnapping was complete long before she was attacked; Ortega, the jury could well have found, tricked her and Chavez into believing that a cocaine delivery would be made after they reached the vacant lot. The victims thus were restrained "by deception" within the contemplation of the statute. *See State v. McGuire,* 110 N.M. at 309, 795 P.2d at 1001 ("Once defendant restrained the victim with the requisite intent to hold her for service against her will, he had committed the crime of kidnapping, although the kidnapping continued throughout the course of defendant's other crimes and until the time of the victim's death."); *State v. Pierce,* 109 N.M. at 601, 788 P.2d at 357 (kidnapping and murder were separate acts where victim was taken for service against her will, transported to a remote location, and killed).

Defendant argues that he could not be convicted of kidnapping on the theory that Grogg was restrained by deception, because the alternative theory of restraint by force was also submitted to the jury and, since there was no evidence supporting that theory and it is impossible to know from the general verdict which alternative the jury selected, the conviction, even if it rests on an alternative as to which there was evidence, must be set aside. He cites

*State v. Shade,* 104 N.M. 710, 722, 726 P.2d 864, 876 (Ct.App.), *cert. quashed sub nom. Vincent v. State,* 104 N.M. 702, 726 P.2d 856 (1986), and *State v. Carr,* 95 N.M. 755, 765, 626 P.2d 292, 302 (Ct.App.), *cert. denied,* 95 N.M. 669, 625 P.2d 1186 (1981), for the proposition that a general verdict of guilty must be set aside where it can be supported on one alternative ground but not on another and it is impossible to tell which ground the jury selected. As we have already ruled, however, there was sufficient evidence for the jury to conclude that Grogg was forcibly restrained, along with the evidence that she was restrained by deception. Accordingly, we hold that Ortega's conviction for kidnapping Grogg (in the course of which she suffered great bodily harm and death) must be upheld.

### IV.

Ortega raises fifteen additional assignments of error. After consideration of each issue raised, we find no error and accordingly conclude that there is no basis for reversal of the judgment. In the interest of brevity, we shall state succinctly our rationale on each issue raised. Most of the issues question the trial court's exercise of discretion; in all such instances we hold that the trial court did not abuse its discretion. The assignments of error and our rulings are as follows:

1. *Refusal to dismiss indictment for State's failure to present exculpatory evidence.* Defendant moved to dismiss the indictment on the ground that the State had failed to present the testimony of three witnesses who had been told things that tended to implicate someone other than defendant in the murders. The trial court concluded that the evidence was hearsay, not based on any of the witnesses' personal knowledge, and did not "directly negate" the defendant's guilt as required under NMSA 1978, Section 31–6–11(B) (Repl. Pamp.1984), to compel presentation. *See also Buzbee v. Donnelly,* 96 N.M. 692, 634 P.2d 1244 (1981). The trial court's ruling was correct.

2. *Refusal to dismiss indictment for State's failure to provide target notice to defendant.* Section 31–6–11(B) requires that a target of a grand jury investigation be notified of his target status, unless the prosecutor is unable with reasonable diligence to notify the target. At the time of the grand jury investigation, Ortega was in California. A secretary in the district attorney's office made several telephone calls to California in an attempt to locate Ortega and mailed him a target notice (although no record existed of the address used in the mailing). The trial court found that the State had used reasonable diligence in an attempt to notify him; we see no basis to upset this finding.

3. *Refusal to admit report of psychological evaluation offered for impeachment.* On cross-examination by the defense, Gonzales denied both that he had been a leader of a gang in Los Angeles and that he had a history of alcohol-related violence. Defendant had sought permission, in an *in camera* hearing, to discredit Gonzales' anticipated denial, first by asking him about prior inconsistent statements given to a psychologist at a state correctional institution, then by introducing the psychologist's testimony and report containing an oral history previously given by Gonzales. The trial court refused to admit this evidence, primarily on the basis of the psychotherapist-patient privilege afforded under Rule 504 of our Rules of Evidence, SCRA 1986, 11–504. On appeal, defendant argues that the statements to the prison psychologist were not privileged because they were intended for the information of the parole board and thus were not confidential. The trial court found otherwise, relying in part on the testimony (in chambers) of the psychologist that Gonzales' statements were intended to be confidential and their disclosure would be inimical to his future treatment. The trial court also ruled that the inconsistency between Gonzales' testimony and his prior statements was over a matter that was "very, very collateral," which it obviously was. We

agree with the court's ruling excluding the proffered evidence on the basis of the psychotherapist-patient privilege; the fact that the oral history might have been communicated to the members of the parole board did not destroy the confidential nature of the communication.

4. *Permitting the State to cross-examine defendant on "prior bad acts."* Ortega testified on direct examination about various "brushes with the law" he had had as an adult: a conviction and an arrest for stealing automobiles, a conviction for transporting marijuana, and an arrest on a DWI charge. He also said he had stolen about fifty automobiles since he was eighteen. On cross-examination, the prosecutor sought and was granted leave to explore further brushes with the law, including many in which the nature of the conduct was probative of untruthfulness. Overruling defendant's objection, the trial court observed that the defense had "opened the door wide open" by eliciting testimony as to certain crimes and that the prosecutor would be permitted to explore others. This was a discretionary ruling as to the scope of cross-examination; additionally, questions as to specific instances of conduct could be asked to attack defendant's credibility under SCRA 1986, 11–608(B).

5. *Refusal to permit defendant to reopen his case to introduce rebuttal evidence.* On rebuttal, the State presented a police witness to testify that defendant was wearing a black jacket when he was arrested on an unrelated charge a few days before the murders. Ortega had previously denied owning such a jacket. On cross-examination, the defense elicited testimony that another jacket—a tan one with a furry collar—had been found in defendant's vehicle at the time of his arrest. (The witness who had identified defendant near the scene of the murders on December 29 had testified defendant had been wearing a tan jacket with a furry collar.) After the evidence was closed, defendant moved to re-open to offer a police inventory sheet, which showed that the only jacket taken from defendant or his vehicle when he was arrested was black, not tan. The court denied the motion because a proper foundation for admission of the inventory sheet had not been laid. This was a discretionary ruling; we cannot say that the court abused its discretion. Additionally, it appears that the purpose of the evidence was to impeach, by extrinsic evidence, the police witness's testimony by contradiction over a collateral issue, which is rarely permitted. *See McCormick on Evidence* § 47 (E. Cleary 3d ed. 1984).

6. *Admission of defendant's statement that victims were not raped.* A witness for the State testified that, while obtaining body samples from Ortega, defendant had questioned the need for a sample of his pubic hair, asking why he needed that since there was no rape. Defendant moved to suppress this testimony on the ground that, although perhaps relevant, its probative value was outweighed by the danger of prejudice and that it should therefore be excluded under SCRA 1986, 11–403. The trial court admitted the testimony, holding that exclusion was not required under Rule 403 but offering to permit defendant's counsel to testify, either in person or by affidavit, that it was he who had imparted to defendant the information that the victims had not been sexually assaulted. Ortega did not avail himself of this opportunity, nor did he testify that he had acquired the information through the press or other sources. We find no abuse of discretion in the trial court's balancing under Rule 403.

7. *Admission of witness's identification of defendant from suggestive photo array and under unreliable circumstances.* The witness who testified he had seen Ortega in Kathy Chavez's Renault on the afternoon of December 29 near the scene of the murders identified defendant as the person he had seen, both during the investigation and in court at

trial. On the first occasion, he identified defendant from a photo array after preparing a sketch that did not resemble defendant's photograph. However, the trial court found, and we certainly agree, that there was nothing about the sketch or anything else that rendered the photo array "impermissibly suggestive," as defendant argues. As for the witness's in-court identification, defendant contends that the circumstances under which the witness observed him—lasting only a few seconds, concentrating on the witness's own driving to avoid a collision, etc.—rendered the identification unreliable under the "totality of the circumstances." However, as the trial court ruled, this was a matter for decision by the jury in its evaluation of the evidence.

8. *Refusal to require disclosure of identity of informants.* Defendant moved to require the State to disclose the identity of various confidential informants. The court conducted an *in camera* hearing on the motion, following which it ordered the State to disclose the identity of two of the informants but ruled that the others could remain confidential. Under SCRA 1986, 11–510(C)(2), disclosure of confidential informants is required only if the trial court finds a reasonable probability that "an informer will be able to give testimony that is relevant and helpful to the defense of an accused, or is necessary to a fair determination of the issue of guilt or innocence." *See State v. Sandoval*, 96 N.M. 506, 632 P.2d 741 (1981). The trial court determined that the informants' information was second- or third-hand hearsay, and nondisclosure was ordered in part out of concern for the safety of the informants. We have reviewed the record of the *in camera* hearing and find no abuse of discretion.

9. *Admission of autopsy photographs over defendant's objections that they were "gruesome and gory."* The court reviewed the photographs in an *in camera* hearing with the forensic patholo-gist, admitting only those it found probative of issues in the case and "weed[ing] out the ones that are surplus, ... so we don't get any bloodier than we have to...." We find no abuse of discretion.

10. *Refusal to grant a mistrial based on a bomb threat and on a newspaper article.* On two separate occasions, defendant moved for a mistrial based on the possibility that the jury had read newspaper articles after the trial began. The first article suggested that defendant might have been responsible for a bomb threat during trial, following which the courtroom had been cleared and court adjourned. The second article stated that defendant was a suspect in another homicide in Arizona. The trial court cautioned the jury after the bomb threat that no inference could be drawn that defendant or anyone on his behalf had made the threat. The court also admonished the jury frequently not to read anything in the newspapers about, or to watch television concerning, the case. There is no indication that the jurors did not heed the court's admonitions or keep an open mind concerning the case. *See State v. Sandoval*, 99 N.M. 173, 655 P.2d 1017 (1982). Once again, nothing is presented to establish that the court abused its discretion.

11. *Grant of immunity to Raymond Gonzales.* The State sought and was granted use and derivative use immunity to Gonzales over defendant's objection. *See State v. Summerall*, 105 N.M. 84, 728 P.2d 835 (Ct.App.1986). Defendant argued that the State's request of a grant of immunity was untimely because counsel would be unable effectively to represent his client. The court thereupon inquired how long a continuance counsel would need to prepare adequately, and counsel replied that three weeks might be necessary. Whereupon the court granted a three-week continuance. No prejudice has been demonstrated and no error shown.

12. *Failure to declare a mistrial based on Gonzales's testimony that defen-*

*dant had threatened him.* Pursuant to *State v. Franklin,* 78 N.M. 127, 428 P.2d 982 (1967), defendant asserts that the court erred by not declaring a mistrial, *sua sponte,* when Gonzales testified he had been threatened by Ortega. However, this testimony took place outside the presence of the jury. The trial court did not err.

■ 13. *Refusal to instruct jury in accordance with defendant's requested instructions.* Defendant tendered requested instructions on the following subjects: witness credibility, bias and hostility of witness, witness interest in outcome of the case, testimony of accomplices called by state, immunity of state's witness, witness using or addicted to drugs, identification testimony, and plea agreement entered into with witness or codefendant. All of the proffered instructions related to credibility of one or more witnesses. Accordingly, their subject matter was already covered by the uniform jury instruction on evaluating the credibility of witnesses, UJI Crim. 14–5020, which was given. The court's refusal to give additional instructions was not error. *See State v. Ramirez,* 79 N.M. 475, 444 P.2d 986 (1968).

14. *Cumulative error.* Since there were no individual errors, there is no basis for defendant's claim of cumulative error. *See State v. Lopez,* 105 N.M. 538, 734 P.2d 778 (Ct.App.1986), *cert. quashed,* 105 N.M. 521, 734 P.2d 761, *cert. denied,* 479 U.S. 1092, 107 S.Ct. 1305, 94 L.Ed.2d 160 (1987).

Finding no error, we affirm the judgment below.

IT IS SO ORDERED.

SOSA, C.J., and RANSOM and FRANCHINI, JJ., concur.

BACA, J., concurs in part, dissents in part.

BACA, Justice (concurring in part, dissenting in part).

I concur in the result reached by the majority. I write separately, however, to express my belief that application of the felony-murder rule, as refined in *State v. Harrison,* 90 N.M. 439, 564 P.2d 1321 (1977), does not infringe on an accused's constitutional rights, and therefore, is sufficient to affirm appellant's conviction. I do not agree that our statute must be construed to require proof of intent to kill for there to be criminal liability for first degree murder, and I do not join in Part II of the majority's opinion. I would affirm based on the proper application of the felony-murder doctrine.

No matter how disfavored the felony-murder rule may be in the eyes of commentators and courts, it is our duty not to replace the legislature's judgment with our own.

> [T]his Court does not sit as a super-legislature with the power to uphold or strike down the laws of the state based upon our own judgment as to the wisdom and proprieties of such laws. So long as the Legislature acts within the parameters of its constitutional powers and limitations, this Court is powerless to intercede.

*State v. Mabry,* 96 N.M. 317, 321, 630 P.2d 269, 273 (1981) (citations omitted).

Our duty is to uphold a statute unless we are satisfied beyond a reasonable doubt that the legislature acted unconstitutionally in enacting it. *State v. Ball,* 104 N.M. 176, 718 P.2d 686 (1986). Because I do not believe the felony-murder statute violates the constitution, I do not agree that this court should interfere with the clear dictates of the legislature.

Initially, I note that the majority does not hold our previous interpretation of the felony-murder rule, NMSA 1978, Section 30–2–1(A) (Repl.Pamp.1984), unconstitutional.[1] The majority suggests that if we were to continue to interpret the doctrine to not require some proof of intent, we *may* overstep constitutional limitations. To avoid any *potential* unconstitutionality,

---

1. In refusing to find that the statute is unconstitutional, the majority is on the side of the clear weight of authority. *See* 40 C.J.S. *Homicide* § 43(c) (1991). In fact, my research has not

it alters the rule contrary to the legislature's intent. I do not believe that is our role. Absent a determination of unconstitutionality, we should interpret the law as the legislature intended. I will first set forth why I believe this court's previous interpretation of the felony-murder rule is constitutionally valid and then attempt to demonstrate why the majority's interpretation of the legislative intent is infirm.

The majority relies on *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), for the proposition that presumptions that invade a jury's function and shift a burden of proof from the state to a defendant are invalid. In my view, that case is inapplicable. In *Harrison,* we noted that "[o]ur felony-murder statute conclusively presumes that any homicide occurring during any felony is first-degree murder." 90 N.M. at 442, 564 P.2d at 1324. The majority relies heavily on that characterization to question the constitutionality of that "conclusive presumption." Our current statute, however, does not contain that presumption.

*Harrison* was decided under our earlier murder statute, which stated:

> Murder is the unlawful killing of one human being by another with malice aforethought, either express or implied, by any means with which death may be caused.

A. Murder in the first degree consists of all *murder* perpetrated:

\* \* \* \* \* \*

(3) in the commission of or attempt to commit any felony.

NMSA 1978, Section 30-2-1 (Orig.Pamp. 1978) (emphasis added).

Despite the plain language of the statute, which would appear to contain an intent requirement for felony murder, this court determined that murder meant homicide, because at common law the intent was supplied by the intent to commit the underlying felony. *State v. Welch,* 37 N.M. 549, 558, 25 P.2d 211, 216 (1933); *see* Thompson & Gagne, *The Confusing Law of Criminal Intent in New Mexico,* 5 N.M.L.Rev. 63, 75 (1974). *Harrison* considered that earlier statute and, thus, relied on a presumption of intent—as that earlier statute had been construed, the express requirement of intent was presumed from the underlying felony.[2] The statute applicable to the present case, however, has expressly excluded a requirement of intent; it states first degree murder is the *killing* of another in the commission or attempt to commit a felony.[3]

In *State v. Pierce,* 109 N.M. 596, 601, 788 P.2d 352, 357 (1990), we considered the amended murder statute and determined that there was no *mens rea* requirement— the state did not bear the burden to prove

---

uncovered a case holding a felony murder statute unconstitutional as a violation of either the eighth amendment or due process.

**2.** The California Supreme Court reached a similar conclusion when construing its felony-murder statute, which was similar to our earlier statute, in *People v. Dillon,* 34 Cal.3d 441, 668 P.2d 697, 194 Cal.Rptr. 390 (1983) (in bank). In that case the court determined that, unlike Michigan, *see People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304 (1980), the California statute incorporated the common law of felony murder into its murder statute, making its statute not merely one of degree fixing, but also a codification of the common law. 34 Cal.3d at 462–73, 668 P.2d at 708–15, 194 Cal.Rptr. at 401–08. In New Mexico, the common law was *incorporated into* our early statute by *Welch;* the legislature acted on the judicial incorporation in 1980, codifying

and streamlining the common law felony-murder rule by making first degree murder a *killing* done in the commission or attempted commission of a felony.

**3.** The current statute, NMSA 1978, Section 30-2-1(A) (Repl.Pamp.1984), states:

> Murder in the first degree is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused:
>     (1) by any kind of willful, deliberate and premeditated killing;
>     (2) in the commission of or attempt to commit any felony; or
>     (3) by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life.

an intent to kill.[4] Thus, *Sandstrom* is inapposite—we are not considering a conclusive presumption of *mens rea*.[5] A jury has not been instructed to presume an element of the crime from some other facts, nor has the state been relieved of its burden to prove a statutory element.[6] The legislature has determined that a killing committed during a felony (as modified by *Harrison*) is first-degree murder, and I am not convinced that the statute is unconstitutional simply because it creates criminal liability for first degree murder when the state has not shown the accused had the intent to kill.

The majority admits that a *mens rea* element is not constitutionally required, but relies on *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), and *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), for the contention that a mental element provides a rationale for punishment. *Supra*, at 1203. Unlike the crimes of conversion or price fixing, however, felony murder contains an element of intent, albeit not the intent to kill. The perpetrator must intend to commit the underlying felony; that felony must be serious, as discussed in *Harrison*, and the state must carry its burden to prove that felony. In that sense felony murder is not a strict liability crime. The legislature has decided that an individual who attempts to commit a felony and who takes a life during the commission of that felony has committed first degree murder. The statute provides notice to such an individual that,

**4.** Obviously, I do not agree with the majority that the statute at issue in *Harrison* is similar to the one now applicable. *Cf. supra*, at 1201–02. The language of the current statute eliminates the *mens rea* inherent in the term "murder" and makes unnecessary the presumption of intent from the underlying felony.

**5.** Even if the current statute is viewed as creating a presumption, however, the presumption at issue here is not analogous to that derided in *Sandstrom*. I agree with the analysis of this issue presented in *People v. Dillon*, 34 Cal.3d at 473–77, 668 P.2d at 715–18, 194 Cal.Rptr. at 408–11. *Dillon* noted that, if the felony-murder rule created a presumption, it did not operate to shift a burden from the state to the defendant, but rather acted to define the substantive law, *i.e.*, malice is not an element of felony murder. *Sandstrom* requires that, if a state defines an element of a crime that must be proved by the prosecution, that burden cannot be shortcut by use of an evidentiary presumption. *Dillon* concluded, however, and I agree, that "[b]ecause the felony-murder rule thus does not in fact raise a 'presumption' of the existence of an element of the crime, it does not violate the due process clause." *Id.* at 476–77, 668 P.2d at 718, 194 Cal.Rptr. at 411; *see also id.* n. 22 (listing jurisdictions finding *Sandstrom* inapplicable); *State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359 (felony murder requires only the intent to commit the underlying felony; once that intent is proved, it is imputed to the killing, and *Sandstrom* is inapplicable), *vacated on other grounds*, —— U.S. ——, 111 S.Ct. 425, 112 L.Ed.2d 409 (1990); *People v. Benson*, 125 Misc.2d 843, 480 N.Y.S.2d 811 (1984) (intent is not an element of the crime of felony murder,

and *Sandstrom* not implicated); *Commonwealth v. Rawls*, 328 Pa.Super. 469, 477 A.2d 540 (1984) (equating of intent to kill with intent to commit a serious felony is permissible legislative decision reflecting the gravity of killing during a serious felony); *State v. Sheffield*, 676 S.W.2d 542 (Tenn.1984) (statute makes killing during a felony first degree murder and does not have the effect of shifting burden of proof to defendant).

Also relevant to this issue is the recent United States Supreme Court case of *Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), a progeny of *Sandstrom*. The Court found impermissible an instruction that allowed the jury to presume that the actual killer had the intent to kill from his use of a deadly weapon and from his commission of an unlawful act, not in the transfer, as a matter of law, of the intent of the perpetrator to the accomplice. The Court was not troubled with the theory of accomplice liability, whereby the jury was instructed that if it found the actual perpetrator had the intent to kill, it could find the defendant-accomplice guilty.

**6.** The majority states: "It is now open to serious question whether ... *any presumption * * * is* constitutional, where the effect of the presumption is to establish, or place on the defendant the burden of proving, that he or she had the requisite *mens rea* to commit first degree murder." *Supra*, at 1203. The statute, however, does not require the intent to commit first degree murder; the jury is not instructed to presume from the underlying felony that a defendant intended to kill the victim. The statute simply allows a separate track to a finding of first degree murder based on a separate evil to be prevented.

should he choose to participate in a serious felony, and should someone be killed, the felon will be subject to criminal liability for first degree murder. I do not believe that this is constitutionally infirm.[7]

Nor do I agree that the eighth amendment is implicated by my analysis. While a *death sentence*, because of its unique nature, is unconstitutional if a defendant, convicted of felony murder, did not intend to kill or personally commit the act against the victim, *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), a capital sentence may be imposed for a felony murder conviction under the appropriate circumstances where the defendant's mental state indicated reckless indifference to human life. *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). The significance of this eighth amendment analysis under our statutory scheme, which precludes a capital sentence unless a murder is committed "with the intent to kill" except in the murder of a peace officer, NMSA 1978, Section 30–20A–5 (Repl.Pamp. 1990), and which thereby creates a standard for imposition of the death penalty higher than is constitutionally required, *see Tison*, 481 U.S. at 158, 107 S.Ct. at 1688, is relatively slight.

Thus, we have not been, and could not be, presented with the question of a death sentence where the defendant did not possess the intent to kill. The majority refers to *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), which it indicates would be authority to hold even a lengthy prison sentence unconstitutional if no *mens rea* was required. The recent case of *Harmelin v. Michigan*, —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (upholding mandatory life sentence without possibility of parole for possession of cocaine), has cast doubt on the validity of the proposition found in *Solem* that the eighth amendment guarantees proportionality in other than capital sentences. When the gravity of a killing committed during a first degree or inherently dangerous felony is considered, I believe it is beyond doubt that serious punishment is within the legislature's prerogative and passes eighth amendment scrutiny.

After its inconclusive constitutional analysis, the majority proceeds to construe the felony-murder statute, which it characterizes as "at most . . . silent on the necessity of an intent-to-kill element, and [which] certainly does not expressly negate any such requirement," to require proof of intent to kill. *Supra*, at 1203–1204. I do not believe the statute, viewed in its historical context, is silent. For the following reasons, I believe the statute clearly does not require an intent to kill.

In 1980, the legislature amended our murder statute, essentially replacing the term "murder" with "killing." I do not believe the word "killing" is ambiguous in this context; if the legislature intended some form of malice requirement, it could have used a term, such as murder, that required malice. Assuming, however, that there is some ambiguity, I do not see how the majority could construe the term "killing" to mean "murder" when the legislature has expressly replaced "murder" with "killing."

"An amendment of an unambiguous statute indicates a purpose to change the law, whereas no such purpose is indicated by the mere fact of an amendment of an ambiguous provision." 1A N. Singer, *Sutherland Statutory Construction* § 22.30 (4th ed. 1985). This court's function should be

---

**7.** On the question of the constitutionality of the traditional felony-murder rule, I have also found relevant the recent United States Supreme Court case of *Schad v. Arizona*, —— U.S. ——, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), wherein the Court addressed the constitutionality of a jury instruction that did not require the jury to agree on whether the defendant was guilty of premeditated murder or felony murder. Unlike the majority in this case, the Court found that the historical acceptance of the felony-murder rule militated in favor of its constitutionality, and, moreover, determined that the two mental states, premeditation and a killing committed during a felony could "reasonably reflect notions of equivalent blameworthiness or culpability." *Id.* at ——, 111 S.Ct. at 2503.

to determine what changes, if any, the legislature intended. First, the legislature had stood pat for nearly fifty years with this court's interpretation of the earlier statute. This provides at least some indication that the legislature did not disagree with that prior construction. *See In re Morrow's Will,* 41 N.M. 117, 64 P.2d 1300 (1937) (legislative inaction indicates acquiescence to judicial interpretation); *cf. State ex rel. Lee v. Hartman,* 69 N.M. 419, 367 P.2d 918 (1961) (court should resort to rule that legislative acquiescence amounts to legislative interpretation only after other tools of interpretation have failed); *Garcia v. Schneider,* 105 N.M. 234, 237, 731 P.2d 377, 400 (Ct.App.1986) (same). It then amended the statute to adopt the interpretation given the prior act, deleting the ambiguous term "murder." This was done to clarify that no intent to murder was required and to eliminate the fiction of presumed intent.

I note the irony of the court's interpretation of the statutory language. In *Welch,* we determined that the word "murder" in the original statute, by implication of the common law, meant killing. Now, we make the Orwellian determination that "killing" means murder. This represents a disregard of the legislative will as expressed through the language employed in its statute.

The majority determines, nonetheless, that, although the *actus reus*—the actual killing—can be perpetrated by a cofelon, a defendant cannot be liable without proof of his or her *mens rea.* Thus, I find confusing the majority's reliance on several of the cases cited *supra,* at 1207 n. 10. First, those cases interpret statutes that differ from ours—they expressly define felony murder as *murder* committed in the perpetration, or attempted perpetration, of a felony. Moreover, at least in several of the jurisdictions, the courts have not limited the felony-murder rule to require that the accused have the requisite intent, even though they have required intent to kill by a codefendant. Thus, in Iowa the courts, construing a revised statute similar to that addressed in *State v. Galloway,* 275 N.W.2d 736 (Iowa 1979), have determined that felony murder requires proof of a defendant's participation in an underlying felony and of a murder, with malice, committed during the felony. *State v. Ragland,* 420 N.W.2d 791, 793 (Iowa 1988). The state does not have to prove, however, that the accused possessed malice aforethought, as long as he participated in the felony and a cofelon possessed malice. *Id.* at 794; *see also Conner v. State,* 362 N.W.2d 449, 455 (Iowa 1985) ("The fact that killing was not within the actual contemplation and intention of one of the parties to the robbery does not relieve such person of the responsibility as long as the other party to the robbery had the necessary *mens rea* and the act was a consequence of carrying out the unlawful common design."). Similarly, *Commonwealth ex rel. Smith v. Myers,* 438 Pa. 218, 261 A.2d 550 (1970), does not require the defendant to have the requisite *mens rea,* as long as a cofelon possessed such intent.

Because the previous interpretation given to our felony-murder statute is not unconstitutional, and because I believe the majority of this court has wrongly interpreted the legislature's intent in refining the rule, I dissent from that part of the opinion revising the doctrine.