APPEL, Justice (dissenting).
The question in this case is whether an unarmed child may be subject to life in prison with the possibility of parole for participating in a marijuana robbery where a coparticipant brought a gun to the crime and killed the robbery victim.
I. History of Felony Murder.
The origin of the felony-murder rule lies in the shadows of the past. Scholars have speculated that it arose because of a mistake made by Lord Coke in summarizing the legal texts of Lord Bracton when he substituted the word murder for homicide in describing death arising out of unlawful conduct. See Leonard Birdsong, Felony Murder: A Historical Perspective by Which to Understand Today's Modern Felony Murder Rule Statutes , 32 T. Marshall L. Rev. 1, 8-9 (2006) [hereinafter Birdsong]; see also James J. Tomkovicz, The Endurance of the Felony-Murder Rule: A Study of the Forces That Shape Our Criminal Law , 51 Wash. & Lee L. Rev. 1429, 1442 (1994) [hereinafter Tomkovicz] (citing the Lord Coke theory along with other possible origins of the felony-murder rule).
In any event, the felony-murder rule was controversial in its country of origin. See Guyora Binder, The Origins of American Felony Murder Rules , 57 Stan. L. Rev. 59, 101-02 (2004) (noting "learned opinions did not support felony murder rule unanimously"); Birdsong, 32 T. Marshall L. Rev. at 15 ("Some of the earliest reported jury instructions on the felony murder rule allude to its unpopularity, and seem to invite the jury to ignore it."); Rudolph J. Gerber, The Felony Murder Rule: Conundrum Without Principle , 31 Ariz. St. L.J. 763, 766 (1999) [hereinafter Gerber] ("The felony murder rule has an extensive history of thoughtful condemnation from at least 1834."). As a matter of practice, the felony-murder rule appears to have been rarely used in England, and when it was, many cases tended to limit its scope by requiring that the defendant participate in an act of violence during the perpetration of the felony or that the killing involved must be a natural and probable consequence of the felon's actions. See Binder, 57 Stan. L. Rev. at 100-03. Yet, the vestiges of the felony-murder rule persisted in theory in England until 1957, when the felony-murder rule was abolished. Birdsong, 32 T. Marshall L. Rev. at 16.
The felony-murder rule took hold in America in the early years of the Republic. In 1794, Pennsylvania passed a statute that at least indirectly embraced felony murder. Id. at 17-18. The vast majority of states eventually followed suit. Id. at 18.
The felony-murder rule has been subject to extensive criticism. See generally Gerber, 31 Ariz. St. L.J. at 766-67, 770 (noting the rule suffers from at least four problems, each alone "fatal to a claim of principled *210 justice"); Nelson E. Roth & Scott E. Sundby, The Felony-Murder Rule: A Doctrine at Constitutional Crossroads , 70 Cornell L. Rev. 446, 491-92 (1985) [hereinafter Roth & Sundby]; Joseph Trigilio & Tracy Casadio, Executing Those Who Do Not Kill: A Categorical Approach to Proportional Sentencing , 48 Am. Crim. L. Rev. 1371, 1408-11 (2011). The thrust of the criticism generally is that moral culpability is at the heart of criminal justice and that for harsh criminal sanctions to be imposed, the perpetrator must manifest the intent, or mens rea, to commit the crime. See Gerber, 31 Ariz. St. L.J. at 770-72.
The felony-murder rule has traditionally been defended on two grounds. First, it is said that the felony-murder rule embraces a theory of transferred intent, namely, that the intent of the cofelon who kills the victim during the course of a felony is transferred to others who participate in the crime. See Steven R. Morrison, Defending Vicarious Felony Murder , 47 Tex. Tech L. Rev. 129, 130, 138, 149 (2014). Under this theory, the traditional mens rea requirement of criminal law is satisfied. The problem with the transferred-intent theory is that it does not comport with facts on the ground. A cofelon may be shocked that his colleague in crime brought a gun, or a knife, to what the cofelon thought would be a petty crime.
The second theory is that the legislature in enacting a felony-murder rule has determined that mens rea is not required to support a conviction. See Kevin Cole, Killings During Crime: Toward a Discriminating Theory of Strict Liability , 28 Am. Crim. L. Rev. 73, 77, 98 n.82 (1990) [hereinafter Cole]. This theory seems more honest, but it amounts to a frontal assault on the traditional notion of criminal justice that a mens rea element is essential before the state imposes severe criminal sanctions. See John G. Malcolm, Morally Innocent, Legally Guilty: The Case for Mens Rea Reform , 18 Federalist Soc'y Rev. 40, 40-41 (2017).
Aside from legal theory, the felony-murder rule has been defended on a number of policy grounds. The rule is defended on the ground that it deters unlawful conduct that leads to the death. See David Crump & Susan Waite Crump, In Defense of the Felony Murder Doctrine , 8 Harv. J.L. & Pub. Pol'y 359, 369-71 (1985). It is also defended on grounds of retributive justice. See Cole, 28 Am. Crim. L. Rev. at 74-78, 121-32.
While the felony-murder rule has been adopted in most American jurisdictions, there has been a trend to limit its scope. Roth & Sundby, 70 Cornell L. Rev. at 446. The scope of felony murder has been limited through a number of techniques, including limiting the crimes from which felony murder may arise, imposing a requirement of proximate cause, requiring some showing of mens rea such as reckless indifference to human life, and adopting an affirmative defense where the cofelon did not participate in the killing in any meaningful way, was not armed with a dangerous weapon, and had no reason to believe that the other participant intended to engage in conduct likely to result in death or physical injury. Id. at 446 & nn.7-8. As noted by one court, "the felony murder doctrine expresses a highly artificial concept that deserves no extension beyond its required application." People v. Phillips , 64 Cal.2d 574, 51 Cal.Rptr. 225, 414 P.2d 353, 360 (1966) (en banc), overruled on other grounds by People v. Flood , 18 Cal.4th 470, 76 Cal.Rptr.2d 180, 957 P.2d 869, 882 n.12 (1998).
The limitations of felony murder adopted in some jurisdictions have not satisfied critics. When the Model Penal Code was promulgated in 1962, it sharply criticized *211 the felony-murder rule as inconsistent with traditional notions of criminal culpability. According to the commentary, "Principled argument in favor of the felony-murder doctrine is hard to find." Model Penal Code § 210.2 cmt. 6, at 37 (Am. Law Inst. 1980).
Academic commentators have continued to attack the felony-murder rule. The parade of negative commentary is long and winding. See Gerber, 31 Ariz. St. L.J. at 766 ("The felony murder rule has an extensive history of thoughtful condemnation."); John Calvin Jeffries Jr. & Paul B. Stephan III, Defenses, Presumptions, and Burdens of Proof in the Criminal Law , 88 Yale L.J. 1325, 1387 (1979) (citing "at least fifty years of sustained academic and judicial hostility" to the felony-murder rule); Jeanne Hall Seibold, The Felony-Murder Rule: In Search of a Viable Doctrine , 23 Cath. Law. 133, 160 (1978) ("The concept of basing the degree of punishment on the seriousness of the result of the criminal act seems grossly misplaced in a legal system which recognizes the degree of mental culpability as the appropriate standard for fixing criminal liability."); Tomkovicz, 51 Wash. & Lee L. Rev. at 1460-65 (noting that despite constant attack on the felony-murder rule, legislators feel pressures to placate a populace that does not care about treating felons fairly).
Yet, in most jurisdictions, some form of felony murder remains on the books. Kentucky, Hawaii, and Ohio have abolished it through legislative action. See People v. Aaron , 409 Mich. 672, 299 N.W.2d 304, 314 & nn.57-58 (1980) (citing the Kentucky and Hawaii statutes); Turk v. State , 48 Ohio App. 489, 194 N.E. 425, 426 (1934) (noting that the common law felony-murder rule is not the law in Ohio and citing Ohio statute that the state must show "purpose and intent to kill" for murder), aff'd , 129 Ohio St. 245, 194 N.E. 453 (1935) (per curiam). In Michigan, the felony-murder rule has been substantially transformed by judicial ruling, if not eliminated. See Aaron , 299 N.W.2d at 325-26.
No one, of course, contends that participants in felonies are not deserving of punishment. A person who knowingly participates in a robbery has the necessary mens rea for a robbery and may be convicted and sentenced for that crime. In some cases, the participant may also have the necessary mens rea for a more serious offense, including involuntary manslaughter and even murder. What the critics insist, however, is that the traditional element of mens rea must accompany any such convictions with serious penological consequences.
II. Background of Felony Murder in Iowa.
Iowa's current felony-murder statute was passed as part of the criminal code revisions adopted by the Iowa General Assembly in 1976 and made effective in 1978. 1976 Iowa Acts ch. 1245, ch. 1, § 702 (codified at Iowa Code § 707.2 (1979)).[11] The new statutory provision stated that "A person commits murder in the first degree when he or she commits murder under any of the following circumstances ... [t]he person kills another person while participating in a forcible felony." Iowa Code § 707.2(2). The statute further provided a list of crimes that were "forcible felonies," including, among other offenses, robbery. Id. § 702.11 ; see generally Douglas Van Zanten, Note, *212 Felony Murder, the Merger Limitation, and Legislative Intent in State v. Heemstra: Deciphering the Proper Role of the Iowa Supreme Court in Interpreting Iowa's Felony-Murder Statute, 93 Iowa L. Rev. 1565, 1576-84 (2008).
In an early case decided shortly after the current felony-murder statute was enacted, we considered whether a showing of malice aforethought for murder was required under the statute. See State v. Galloway, 275 N.W.2d 736, 738 (Iowa 1979) (applying old version of felony-murder statute and noting recent Code changes did not alter the analysis), abrogated on other grounds by State v. Schutz , 579 N.W.2d 317, 320 (Iowa 1998). We answered the question in the affirmative. Id. In Galloway , the defendant objected to a jury instruction which did not require the prosecution to prove malice aforethought, but the court refused to add the requested language. Id. The Galloway court reversed, noting "[m]alice aforethought is a necessary element for murder. ... And murder must be committed in order to implement our felony-murder rule." Id . In light of Galloway , it appears that while the common law felony-murder rule requires only a killing, the Iowa statute requires a murder. See Iowa Code § 707.2(1)(b ) (2015) ("A person commits murder in the first degree when the person commits murder under any of the following circumstances: ... [t]he person kills another person while participating in a forcible felony." (Emphasis added.)).
Yet, the situation has become clouded by the manner in which we have allowed malice to be proven. In State v. Veverka , 271 N.W.2d 744, 747 (Iowa 1978), we held that required malice "may be implied from circumstances such as an intent to commit a felony from which death results." Although stated in permissive terms, an instruction providing that malice may be inferred from an intent to commit a felony from which death results sounds a lot like the common law rule, namely, that any killing can give rise to murder if it occurred in the course of a felony. See Kristy L. Albrecht, Note, Iowa's Felony-Murder Statute: Eroding Malice and Rejecting the Merger Doctrine , 79 Iowa L. Rev. 941, 950 & n.71 (1994) [hereinafter Albrecht]. Thus, in State v. Taylor , 287 N.W.2d 576, 578 (Iowa 1980), we again stated that malice may be shown by the commission of a felony, and in Schrier v. State , 347 N.W.2d 657, 666-67 (Iowa 1984), we held that counsel was not ineffective for failing to object to a felony-murder instruction that allowed the state to prove malice simply by proving an underlying felony. Under this approach, when the malice to support the murder element of Iowa's felony-murder statute is not independent of the commission of a felony, the legislature's limitation of felony murder to murders rather than mere killings does indeed ring "hollow." Albrecht, 79 Iowa L. Rev. at 955.
We considered questions related to the scope of felony murder in Conner v. State , 362 N.W.2d 449 (Iowa 1985). In Conner , the defendant challenged his first-degree murder conviction under the Iowa felony-murder rule on the ground that by presuming malice was present, the statute violated due process under the United States Constitution. Id. at 455. The defendant cited Sandstrom v. Montana , 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and its precursors for the proposition that a criminal statute violates due process if it imposes an irrebuttable presumption regarding facts necessary to support a conviction. Conner , 362 N.W.2d at 455-56.
In Conner, we departed from the transferred-intent model of analysis, which would have exposed the felony-murder rule to due process attack, and instead declared that elimination of the mens rea requirement was not an irrebuttable presumption *213 but instead "a matter of substantive law that places responsibility on a wrongdoer for the direct and indirect consequences of his joint criminal conduct with another." Id. at 456. We came to a similar conclusion in State v. Ragland , 420 N.W.2d 791, 794 (Iowa 1988), overruled on other grounds by State v. Heemstra , 721 N.W.2d 549, 558 (Iowa 2006). Ragland and Conner involved claims under the United States Constitution only. Ragland , 420 N.W.2d at 793 ; Conner , 362 N.W.2d at 455.
A significant question under the new felony-murder statute was whether we would recognize the merger rule, namely, that an assault that resulted in a homicide merged and could not provide the predicate felony for felony murder. In State v. Beeman , we declined to recognize the merger doctrine under our felony-murder statute. 315 N.W.2d 770, 777 (Iowa 1982), overruled by Heemstra , 721 N.W.2d at 558. We noted that felonious assault was listed by the legislature as one of the predicate offenses that could give rise to the felony-murder rule. Id. We therefore declined to adopt the merger rule. Id. We reaffirmed the Beeman holding in a number of cases. See State v. Anderson , 517 N.W.2d 208, 214 (Iowa 1994), overruled by Heemstra , 721 N.W.2d at 558 ; State v. Rhomberg , 516 N.W.2d 803, 805 (Iowa 1994), overruled by Heemstra , 721 N.W.2d at 558 ; Ragland , 420 N.W.2d at 793.
In Heemstra , we reconsidered the question of whether the felony of willful injury could be used as a predicate crime or whether willful injury merged with the resulting homicide to prevent application of the felony-murder rule. 721 N.W.2d at 554. In Heemstra , we charted a new course. Id. We noted that felony murder was one of the most controversial doctrines in the field of criminal law. Id. The Heemstra court noted that without the merger rule, the law could "test the outer constitutional parameters of our felony-murder law." Id. at 555. We cited, among other things, a California case where the court had declared that refusing to recognize merger would extend the operation of the rule "beyond any rational function that it is designed to serve." Id. at 556 (quoting People v. Ireland , 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580, 590 (1969) (en banc)). The Heemstra court was determined not to create what one commentator had called "an ever-expanding felony murder rule." Id. at 558 (quoting 4 Robert R. Rigg, Iowa Practice Criminal Law (I) § 3:16 (2006)).
Even with the limitations, the felony-murder rule has produced some troublesome results. In Ragland , a child knowingly participated in a fight with a rival group of children. 836 N.W.2d 107, 110 (Iowa 2013). During the course of the ensuing fight, one of his compatriots struck a person on the head with a tire iron, causing death. Id. The actual perpetrator of the crime plead guilty to second-degree murder and served a three-year prison sentence before being released. Id. at 112. Ragland went to trial, was convicted of felony murder, and received a life sentence. Id. at 110. In a letter to the county attorney, the actual perpetrator asked, "How can it be that I, the person who is actually directly responsible for [the victim's] death was given a second chance and am allowed to live freely in society, but Jeff Ragland is not?" Id . at 112.
III. Felony-Murder Cases in Other States.
A. Introduction. There have been relatively few cases challenging the constitutionality of the felony-murder rule. The older cases generally, however, reject due process challenges. See, e.g. , People v. Dillon , 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697, 718 (1983) (en banc);
*214 State v. Nichols , 225 Mont. 438, 734 P.2d 170, 177 (1987) ; Cotton v. Commonwealth , 35 Va.App. 511, 546 S.E.2d 241, 244 (2001). These cases tend to emphasize the ability of the legislature to define the crimes and then proceed to construe the scope of felony-murder statutes as narrowly as possible. A narrow result may be powered by the desire to avoid due process constitutional infirmities that might result from broader interpretations of felony-murder statutes. See, e.g. , State v. Ortega , 112 N.M. 554, 817 P.2d 1196, 1204 (1991), abrogated on other grounds by Kersey v. Hatch , 148 N.M. 381, 237 P.3d 683, 689 (2010).
B. People v. Aaron . The first such case is Aaron , 299 N.W.2d 304. In this case, the Michigan Supreme Court, in a lengthy and highly footnoted opinion, considered the validity of the felony-murder rule in Michigan. Id. at 324. The Aaron court abrogated felony murder in that state. Id. at 326. Although the case does not directly deal with a constitutional challenge to a state statute, the approach of Aaron to the felony-murder rule is instructive on potential constitutional issues.
The Aaron court first surveyed caselaw and legislative developments regarding the felony-murder rule. Id. at 312-16. The court noted that the wisdom of the felony-murder rule had long been questioned, citing a Pennsylvania court's declaration stating "how shaky are the basic premises on which (the felony murder rule) rests" and a California decision characterizing the felony murder doctrine as expressing "a highly artificial concept." Id. at 313-14 (first quoting Commonwealth ex rel. Smith v. Myers , 438 Pa. 218, 261 A.2d 550, 555 (1970) ; and then quoting Phillips , 51 Cal.Rptr. 225, 414 P.2d at 360 ). The Aaron court cited numerous limitations placed on the felony-murder rule by courts and by legislatures. Id. at 314-16.
The Aaron court next focused its discussion on the issue of moral culpability. Id. at 316-17. Citing authorities for the proposition that culpability represents a basic principle of criminal law, the court observed that the felony-murder rule "completely ignores the concept of determination of guilt on the basis of individual misconduct." Id. With respect to first-degree murder, the court noted that while murder ordinarily requires "a showing of premeditation, deliberation and willfulness," felony murder "only requires a showing of intent to do the underlying felony." Id. at 317.
The Aaron court noted academic authorities that had condemned the felony-murder rule. See id. The court favorable cited a commentator who declared that "the felony-murder doctrine gives rise to what can only be described as an emotional reaction, not one based on logical and abstract principles." Id. (quoting Note, Recent Extensions of Felony Murder Rule , 31 Ind. L.J. 534, 543 (1956)). The court further cited a treatise that noted in 1771 it was observed that the felony-murder doctrine "is surely repugnant to that noble, and active confidence, which a free people ought to possess in the laws of their constitution, the rule of their actions." Id. at 318 (quoting Jerome Hall, General Principles of Criminal Law 455 (1947)).
In the end, the Aaron court held that malice is an essential part of any murder, whether it occurred in the course of a felony or otherwise. Id. at 319. The court emphasized that the necessary malice, in the appropriate case, might be inferred from the circumstances of the crime. Id. at 327. The issue of malice, however, is for the jury, which "may not find malice from the intent to commit the underlying felony alone." Id.
C. State v. Ortega . A second case of interest is Ortega , 817 P.2d 1196. The felony *215 murder statute in New Mexico at the time was quite broad, triggered by any killing that occurred in the course of any felony. Id. at 1202. The New Mexico Supreme Court interpreted the statute, however, to require that the defendant "intended to kill (or had the state of mind otherwise generally associated with mens rea )." Id. at 1204. The Ortega court concluded that "proof that a killing occurred during the commission or attempted commission of a felony will no longer suffice to establish murder in the first degree" under the felony-murder rule. Id. at 1205. Instead, according to the court, the state must show that the defendant had the mens rea sufficient to support second-degree murder, which then could be elevated to first-degree murder when a felony is involved. Id.
The Ortega decision was based on three propositions. Id. at 1204. First, the Ortega court emphasized that in Anglo-American law, serious nonregulatory crimes require criminal intent. Id. Second, if criminal intent is supplied merely by participation in a felony, the "one runs headlong into Sandstrom ." Id. Third, the Ortega court found its approach most consistent with the structure of the homicide provisions of New Mexico law. Id. at 1206.
D. Lowry v. State . The third case is Lowry v. State , 376 S.C. 499, 657 S.E.2d 760 (2008). In Lowry, the South Carolina Supreme Court considered the constitutionality of jury instructions related to felony murder. Id. at 763. The challenged instruction stated felony murder arose if "a person kills another in the doing or attempting to do an act which is considered a felony." Id. at 762. The Lowry court held the trial court's supplemental jury charge created a mandatory presumption of the malice element and violated the defendant's due process rights. Id. at 764.
E. People v. Dillon . The fourth case worthy of note is Dillon , 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697. In Dillon, a seventeen-year-old boy was convicted of first-degree murder under California's felony-murder rule arising from an attempted robbery. Id. , 194 Cal.Rptr. 390, 668 P.2d at 700. The defendant and others scouted a small marijuana farm on two prior occasions, only to be chased off by an owner armed with a shotgun. Id. A larger group engaged in a third foray, this time armed with various weapons including shotguns and a .22 caliber semi-automatic rifle possessed by Dillon. Id. , 194 Cal.Rptr. 390, 668 P.2d at 701. They also brought various equipment for harvesting the marijuana. Id. Some of the party left the scene after a couple of hours, but Dillon and his companion remained. Id. When the owner emerged in close proximity with his shotgun pointed outwards, Dillon shot him nine times with his rifle. Id. , 194 Cal.Rptr. 390, 668 P.2d at 701, 723.
In Dillon , the child took the stand and described his state of mind, from youthful bravado to sheer panic as events unfolded. Id. , 194 Cal.Rptr. 390, 668 P.2d at 722-23. With respect to the shooting, Dillon testified, "I just pressed the trigger, I was so scared.... I just kept squeezing it, and shots just went off." Id. , 194 Cal.Rptr. 390, 668 P.2d at 723. A clinical psychologist testified regarding Dillon's immaturity, poor judgment and planning, and found him acting as a much younger child. Id. The psychologist testified that Dillon, when confronted with the armed owner, probably " 'blocked out' the reality of the situation and reacted reflexively, without thinking at all." Id.
The jury seems to have credited the child's testimony. See id. , 194 Cal.Rptr. 390, 668 P.2d at 724. At the close of evidence, the jury sent the judge a note asking what the purpose of the psychologist's *216 testimony was. Id. , 194 Cal.Rptr. 390, 668 P.2d at 723. The court simply responded by directing the jury to follow the instructions. Id. During deliberations, the jury sent the judge a note asking whether it could convict the defendant of second-degree murder rather than first-degree murder. Id. , 194 Cal.Rptr. 390, 668 P.2d at 724. The judge reread the instruction and further declared that if the defendant was guilty of felony murder, it must be murder in the first degree. Id. The jury convicted the defendant of attempted robbery and first-degree murder. Id.
The court advised the jury when discharging it that "[t]his felony murder rule is a very harsh rule and it operated very harshly in this case." Id. Yet, the court advised the jury that the court had an option of committing the defendant to the Youth Authority rather than sending him to prison. Id. The judge invited the jury to provide whatever observations they might care to make about ultimate disposition of the case. Id. The foreman of the jury responded by stating that it was extremely difficult for the jurors to render the verdict since the defendant "by moral standards is a minor." Id. Expressing the consensus of most or all jurors, the foreman urged the judge to give the defendant "his best opportunity in life" by committing Dillon to the Youth Authority. Id. The district court followed the advice of the jury, but the Court of Appeals ruled that at the time the offense was committed, Dillon was ineligible as a matter of law to be committed to the Youth Authority. Id. , 194 Cal.Rptr. 390, 668 P.2d at 725-26. The case was remanded for resentencing, and the district court, left with no choice, sentenced Dillon to life in prison. Id. , 194 Cal.Rptr. 390, 668 P.2d at 726.
In reviewing the conviction and sentence, the California Supreme Court rejected challenges to felony murder based upon due process, reasoning that the legislature had defined the crime so as not to require a mens rea element for felony murder. Id. , 194 Cal.Rptr. 390, 668 P.2d at 718. That, however, was not the end of the matter, as the court turned to the question of whether a first-degree murder conviction could be supported against the seventeen-year-old defendant under the facts and circumstances of the case. See id. , 194 Cal.Rptr. 390, 668 P.2d at 719.
The court noted that the record showed that the defendant at the time of the events "was an unusually immature youth." Id. , 194 Cal.Rptr. 390, 668 P.2d at 726-27. According to the court, the defendant was "not the prototype of a hardened criminal who poses a grave threat to society." Id. , 194 Cal.Rptr. 390, 668 P.2d at 727. The court noted there was "ample evidence that because of his immaturity he neither foresaw the risk he was creating nor was able to extricate himself without panicking when that risk seemed to eventuate." Id. The court further noted the discrepancy in punishment of the defendant compared to his coconspirators in the venture, who, although they did not pull the trigger, nonetheless had armed themselves with shotguns and knives. Id.
In the end, the court found life in prison violated the cruel and unusual punishment clause of the California Constitution. Id. Because he intentionally killed the victim without legal provocation, however, the defendant was guilty of second-degree murder. Id. The conviction was affirmed as modified, and the case remanded to the district court for resentencing. Id. Because the defendant was no longer guilty of first-degree murder, the district court on remand was "to determine whether to recommit him to the Youth Authority." Id.
IV. Framework of Challenges to the Felony-Murder Rule.
A. Transferred Intent and Due Process. The notion that the felony-murder *217 rule embraces a theory of transferred intent may be attacked on the ground that it violates due process and constitutes cruel and unusual punishment. The outlines of the argument were developed some decades ago by Roth and Sundby. See Roth & Sundby, 70 Cornell L. Rev. at 460-90.
The argument begins with In re Winship , 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In In re Winship , the United States Supreme Court emphasized that under the Due Process Clause of the United States Constitution, the accused is protected "against conviction except upon proof of every fact necessary to constitute the crime with which he is charged" beyond a reasonable doubt. Id. at 364, 90 S.Ct. at 1073. In Mullaney v. Wilbur , the Court emphasized that the state could not shift the burden of proof to the defendant to show "heat of passion" sufficient to avoid conviction of murder. 421 U.S. 684, 703-04, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975).
The Supreme Court then seemed to retreat from In re Winship and Mullaney in Patterson v. New York , 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). In Patterson , the Court upheld a state statute that required the defendant to prove the affirmative defense of severe emotional distress to a charge of murder. Id. at 205-06, 97 S.Ct. at 2324-25. Language in Patterson emphasized that the state had the power to define the elements of the crime. Id. at 205, 97 S.Ct. at 2324. At the same time, however, the court indicated that there were constitutional limits to the state's definitional power. Id. at 210, 97 S.Ct. at 2327.
The United States Supreme Court case revisited Mullaney and Patterson issues in Sandstrom , 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. In Sandstrom the trial court had instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts." Id. at 512, 99 S.Ct. at 2453. The Sandstrom Court found the instruction flawed because it shifted the burden of proving intent. Id. at 524, 99 S.Ct. at 2459.
The felony-murder rule has been justified under a theory of "transferred intent," namely, that the mens rea required for murder is provided by imputing the mens rea from the defendant's felonious act. See Roth & Sundby, 70 Cornell L. Rev. at 453. Once a jury concludes that a killing had been committed in the course of the commission of a felony, the necessary culpability required for murder must be presumed. See id. at 460. The presumption of the necessary mens rea as arising out of something else-namely the commission of a felony where another has murdered someone-is subject to serious challenge under Sandstrom . Id. at 469.
B. Legislative Definitions of Crime and Due Process and Cruel and Unusual Punishment. A second theoretical defense of felony murder eschews any fictitious transferred intent but emphasizes the ability of the legislature to define crimes. According to this theory, the legislature is free to enact a felony-murder rule that does not require the state to prove the traditional mens rea normally associated with the crime of murder. But a bedrock principle of criminal law has been that imposition of serious criminal sanctions ought to reflect culpability.
The United States Supreme Court considered the question of mens rea requirement in Morissette v. United States , 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). In Morissette , the defendant had taken what he thought were abandoned shell casings from a government bombing range, compressed the shells, and sold the metal for $84. Id. at 247, 72 S.Ct. at 242. He was charged with conversion of government property. Id. at 248, 72 S.Ct. at 242. The *218 trial court refused to allow the defendant to assert that he believed the property was abandoned on the ground that intent was presumed. The United States Court of Appeals for the Sixth Circuit affirmed, holding the statute did not require the government to prove criminal intent. Id. at 249-50, 72 S.Ct. at 242-48.
The Supreme Court reversed. Id. at 276, 72 S.Ct. at 256. In an opinion by Justice Jackson, the Court noted,
The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to...."
Id. at 250-51, 72 S. Ct. at 243 (footnote omitted).
Even where a statute did not expressly include an intent requirement, the Morissette Court emphasized "[c]ourts, with little hesitation or division, found an implication of the requirement as to offenses that were taken over from the common law." Id . at 252, 72 S.Ct. at 244. The Court declined to depart from the common law mens rea requirement in light of the statutory silence in federal conversion law. Id. at 262, 72 S.Ct. at 249. Citing a state supreme court case, the Court noted, "It is alike the general rule of law, and the dictate of natural justice, that to constitute guilt there must be not only a wrongful act, but a criminal intention." Id. at 274, 72 S.Ct. at 255 (quoting People v. Flack , 125 N.Y. 324, 26 N.E. 267, 270 (1891) ). The Court recognized that while the mens rea element might be eliminated for certain regulatory crimes, the Court declined to do so for crimes under the federal conversion statute. Id. at 262-63, 72 S.Ct. at 249-50. While to do so might "ease the prosecution's path to conviction," it would "change the weights and balances in the scales of justice." Id. at 263, 72 S.Ct. at 249 ; see also United States v. U.S. Gypsum Co. , 438 U.S. 422, 436-37, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978).
The United States Supreme Court considered the role of culpability in two felony-murder cases involving the death penalty in Enmund v. Florida , 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona , 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In Enmund , the Court considered a case in which a nontriggerman getaway driver was convicted of felony murder and sentenced to death. 458 U.S. at 784-85, 102 S.Ct. at 3370. In Tison, the Court considered a felony-murder case in which the defendants did not pull the trigger but were deeply involved in an underlying crime. 481 U.S. at 139-41, 107 S.Ct. at 1678-79.
In Enmund , the defendant drove the getaway car in an armed robbery. 458 U.S. at 784, 102 S.Ct. at 3370. His compatriots approached the targeted house and engaged in a fight with the occupants; as a result, the residents were killed. Id. at 784, 102 S.Ct. at 3369-70. Pursuant to Florida law, the district court instructed the jury that "[t]he killing of a human being while engaged in the perpetration of or in the attempt to perpetrate the offense of robbery is murder in the first degree even though there is no premeditated design or intent to kill." Id. at 784-85, 102 S.Ct. at 3370 (alteration in original). The defendant was convicted and sentenced to death. Id. at 785, 102 S.Ct. at 3370. The defendant appealed, claiming that the imposition of the death penalty under the circumstances violated the Eighth Amendment proscription *219 against cruel and unusual punishment. Id. at 787, 102 S.Ct. at 3371.
The Supreme Court agreed. Id. at 801, 102 S.Ct. at 3378-79. The Enmund Court emphasized that to impose the death penalty pursuant to a felony-murder conviction of a nontriggerman would not further either of the goals of deterrence or retribution. Id. at 800, 102 S.Ct. at 3378. With respect to deterrence, the Court noted that "if a person does not intend that life be taken ... the possibility that the death penalty will be imposed for vicarious felony murder will not 'enter into the cold calculus that precedes the decision to act.' '' Id. at 799, 102 S.Ct. at 3377 (quoting Gregg v. Georgia , 428 U.S. 153, 186, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976) ). Aside from a lack of intent that might be deterred, the Court noted that there was no reason to believe that death so frequently occurs during the course of a felony that it would be a substantial deterrent to the underlying felony itself. Id. at 799, 102 S.Ct. at 3377-78. The Enmund Court further cited three studies that indicated the incidence of murder that occurred in connection with robberies hovered at only approximately .5%. Id. at 799-800 nn.23-24, 102 S.Ct. at 3378 nn.23-24.
The Enmund Court then turned to retribution. Id. at 800, 102 S.Ct. at 3378. The Court concluded that it was unconscionable to treat the triggerman and the nontriggerman alike for purposes of imposing the death penalty. Id. at 801, 102 S.Ct. at 3378. According to the Enmund Court, "American criminal law has long considered a defendant's intention-and therefore his moral guilt-to be critical to 'the degree of [his] criminal culpability.' " Id. at 800, 102 S.Ct. at 3378 (alteration in original) (quoting Mullaney , 421 U.S. at 698, 95 S.Ct. at 1889 ). The defendant's punishment in Enmund , according to the Court, was not "tailored to his personal responsibility and moral guilt." Id. at 801, 102 S.Ct. at 3378.
The Court took a different tack in Tison , 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127. In Tison , the Court considered whether the death penalty arising from felony murder could be applied in a case where the defendants were substantial participants in the crime and where they manifested a reckless disregard for human life. See id. at 139-41, 107 S.Ct. at 1678-79. In Tison , the defendants were involved in a carefully planned and heavily armed effort to free their father and another convicted murderer from prison. Id. at 139, 107 S.Ct. at 1678. The prison break at first succeeded, with the escapees and his rescuers fleeing the area in a Lincoln automobile. Id. at 139, 107 S.Ct. at 1679. When the car ultimately had a flat tire, the party flagged down a family in a passing vehicle. Id. at 139-40, 107 S.Ct. at 1679. The family was kidnapped and their car and the Lincoln driven into the desert. Id. at 140, 107 S.Ct. at 1679. While the family, standing in front of the Lincoln, pled for their lives, the father and another compatriot fatally shot the family. Id. at 140-41, 107 S.Ct. at 1679. The defendants at the time were near the other automobile where they had gone to fetch water for the victims. Id. The defendants were convicted of felony murder, sentenced to death, and lost their appeal. Id. at 141-43, 107 S.Ct. at 1680. They then launched a postconviction-relief challenge to their death sentence, calling it cruel and unusual under the Eighth Amendment. Id. at 143, 152, 107 S.Ct. at 1680-81, 1685.
The Tison Court upheld the death sentences. Id. at 158, 107 S.Ct. at 1688. The Court observed that in Enmund , "the Court found that Enmund's degree of participation in the murders was so tangential that it could not be said to justify a sentence of death." Id. at 148, 107 S.Ct. at 1683 (emphasis omitted). In contrast, in *220 Tison , the defendants participated extensively in the escape, intentionally brought guns into the prison to arm the murderers, participated fully in kidnapping and robbery, and, after the murders, did nothing to aid the victims. Id. at 151-52, 107 S.Ct. at 1685. Unlike in Enmund , the involvement of the defendants in the crimes was not minor, but "substantial." Id. at 158, 107 S.Ct. at 1688. The Tison Court held that the defendants' major participation in the felony committed, combined with reckless indifference to human life, was sufficient to satisfy the Enmund culpability requirement. Id.
Justice Brennan and three other members of the court dissented. Id. at 159, 107 S.Ct. at 1689 (Brennan, J., dissenting). According to Justice Brennan, the felony-murder rule was a curious "living fossil from a legal era in which all felonies were punishable by death." Id. Justice Brennan saw parallels with Enmund . Id. at 161, 107 S.Ct. at 1690. In both cases, the defendants did not shoot the victims and there was nothing in the record to indicate intent to kill. Id. Justice Brennan rejected the notion that a reckless actor could be held to the same degree of accountability as an intentional actor, noting that "[t]he reckless actor has not chosen to bring about the killing in the way the intentional actor has." Id. at 170, 107 S.Ct. at 1695. According to Justice Brennan, "the criminal law must ensure that the punishment an individual receives conforms to the choices that individual has made." Id. at 171, 107 S.Ct. at 1695. As a result, Justice Brennan argued that the death penalty could not be imposed under the facts presented. Id. at 182, 107 S.Ct. at 1701.
C. Application of Felony Murder to Children in Light of Recent Developments in Juvenile Justice. As can be seen above, the felony-murder rule generally has substantial due process and proportionality problems. These well recognized challenges are greatly magnified in the context of juvenile offenders. This case involves more than the conventional challenges to felony murder, but because a child is involved the due process and cruel and unusual punishment claim are on legal steroids. A body of literature has recently developed suggesting that, at least as applied to children, the felony-murder rule is unconstitutional. See Steven A. Drizin & Allison McGowen Keegan, Abolishing the Use of the Felony-Murder Rule When the Defendant Is a Teenager , 28 Nova L. Rev. 507, 535-42 (2004) ("[W]e believe that there should be an absolute ban on the felony-murder doctrine for child defendants under the age of fourteen...."); Emily C. Keller, Constitutional Sentences for Juveniles Convicted of Felony Murder in the Wake of Roper, Graham, & J.D.B., 11 Conn. Pub. Int. L.J. 297, 309-23 (2012) [hereinafter Keller] (arguing life sentences without parole for juvenile convicted of felony murder is unconstitutional).
Recent challenges to the application of felony murder to juveniles emphasize the juvenile justice cases recently decided by the United States Supreme Court. See generally Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) ; J.D.B. v. North Carolina , 564 U.S. 261, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011) ; Graham v. Florida , 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) ; Roper v. Simmons , 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The thrust of the argument is that while the felony-murder rule is generally in a weak position, it simply cannot be sustained with respect to juvenile offenders. See Keller, 11 Conn. Pub. Int. L.J. at 316-18.
First, critics note that the deterrence rationale supporting felony murder is already weak with respect to adults. In Enmund, the Supreme Court stated that it *221 was "quite unconvinced ... that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken." 458 U.S. at 798-99, 102 S.Ct. 3368 ; see also Keller, 11 Conn. Pub. Int. L.J. at 317.
If the Court is unconvinced that the death penalty in the felony-murder rule is a deterrent for adults, the Court would surely be unconvinced that life in prison with the possibility of parole would provide a deterrent for children who do not intend that life will be taken. In Graham , for instance, the Supreme Court noted that juveniles "are less likely to take a possible punishment into consideration when making decisions." 560 U.S. at 72, 130 S.Ct. at 2028-29. In Roper , the Supreme Court noted "[t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." 543 U.S. at 572, 125 S.Ct. at 1196 (alteration in original) (quoting Thompson v. Oklahoma , 487 U.S. 815, 837, 108 S.Ct. 2687, 2700, 101 L.Ed.2d 702 (1988) ). As our court has noted, "children lack the risk-calculation skills adults are presumed to possess and are inherently sensitive, impressionable, and developmentally malleable." State v. Lyle , 854 N.W.2d 378, 389 (Iowa 2014) ; see also Keller, 11 Conn. Pub. Int. L.J. at 317-18. In State v. Null , we summed up the developments by noting that juvenile brains are not fully developed for executive functioning which effect behaviors "such as reasoning, abstract thinking, planning, the anticipation of consequences, and impulse control." 836 N.W.2d 41, 55 (Iowa 2013).
Second, critics maintain that the retributive goals of criminal punishment have less force as applied to juveniles. Retribution is an appropriate goal for morally culpable offenders. But the felony-murder rule does not require the individual mens rea ordinarily required to support a murder conviction. With respect to children, the retributive goals of the felony-murder rule are further diminished because of the characteristics of youth. See Roper , 543 U.S. at 571, 125 S.Ct. at 1196 ; see also Keller, 11 Conn. Pub. Int. L.J. at 316-17.
V. Discussion.
Justice Frankfurter noted long ago that "not the least significant test of the quality of a civilization is its treatment of those charged with crime, particularly with offenses which arouse the passions of a community." Irvin v. Dowd , 366 U.S. 717, 729, 81 S.Ct. 1639, 1646, 6 L.Ed.2d 751 (1961) (Frankfurter, J., concurring). Harrison is guilty of significant crime and deserves to be punished accordingly. But the application of the felony-murder rule to him distorts the criminal justice system beyond recognition.
First, although he certainly had the necessary mens rea to commit the robbery, the instructions in this case permitted the jury to find that if he was guilty of the crime of robbery, Harrison was also guilty of felony murder, or murder in the first degree. For all the reasons in the authorities cited above, this is a troublesome state of affairs. In order to comport with fundamental fairness, the issue is not whether Harrison had sufficient moral culpability to support robbery. He did. The issue is whether Harrison had sufficient moral culpability to support first-degree murder and a life sentence with possibility of parole, merely because of his participation in the robbery. In order to support such a conviction consistent with due process, the state must prove the elements of the underlying felony and, independently, sufficient malice to support a conviction of murder. Yet, the instructions permitted *222 the jury to find Harrison guilty of murder without a finding of malice independent of the underlying felony.
Further, the limited moral culpability that may be assigned to Harrison is further diminished by the fact that he was a child. Without question, the teachings of Miller , Graham , and Roper establish that the moral culpability of juveniles even for horrendous crimes is diminished by their lack of neurological and psychological development. Thus, the very thin basis of culpability that might support the felony-murder rule in some circumstances is further diminished by the age of Harrison.
Second, there is the issue of deterrence. As was powerfully pointed out in Enmund, it is hard to understand how the felony-murder rule deters when the defendant has no intention to commit the crime. 458 U.S. at 798-99, 102 S.Ct. at 3377. As with moral culpability, the deterrence rationale for felony murder, already thin, is further diminished by the fact that Harrison was seventeen at the time of the offense.
It is true that in this case, Harrison was not sentenced to life in prison without the possibility of parole. Instead, he was sentenced to life in prison with the possibility of parole as required by State v. Sweet , 879 N.W.2d 811, 839 (Iowa 2016). Yet, there can be little doubt that his conviction of first-degree murder, albeit through a highly attenuated application of the felony-murder rule, is going to dramatically increase his prison term beyond that which would have been imposed had he been convicted merely of robbery.
There is no occasion today to reconsider whether the felony-murder rule is categorically unconstitutional on grounds of due process as applied to adults. That is not the issue before us. Instead, the question is whether the felony-murder rule as applied to children is so attenuated from traditional notions of due process of law. For the above reasons, I would conclude that application of the felony-murder rule to persons under the age of eighteen is so lacking in relationship to criminal culpability as to amount to a violation of due process under both the United States and the Iowa Constitutions.
I also write to express disagreement with the majority's approach to cruel and unusual punishment under the Iowa Constitution. First, I note that no party before this court has advocated that Iowa should not follow the standards for determining cruel and unusual punishment set out in State v. Bruegger , 773 N.W.2d 862, 884 (Iowa 2009), and State v. Oliver , 812 N.W.2d 636, 640 (Iowa 2012). We have not held that the federal standards are applicable under the Iowa Constitution as there has been no case where the issue has been contested.
In any rate, in applying the federal standards, I would not put much weight onto the national consensus in considering the issue before us. The exploration of national consensus is a technique utilized by the United States Supreme Court to address its federalism concerns, namely, a concern that the United States Supreme Court must set a nationwide standard. Such federalism concerns tend to dilute the scope of individual rights and drive the decision toward a lowest acceptable common denominator. Such federalism concerns simply are not applicable when a state considers a constitutional question that does not apply outside the state.
In addition, I do not agree with the majority's handling of Bruegger in considering an as-applied standard. In Bruegger, we found that there was reason to believe that an as-applied challenge under article I, section 17 may be present. 773 N.W.2d at 885. Among other factors, we cited the breadth of the underlying statute, Bruegger's *223 age when the predicate offense was committed, and the geometric increase in criminal sanction. Id. at 884-85.
First, the breadth of the crime, the age of Bruegger when the predicate offense was committed, and the geometric increase in sentence, were factors , not criteria . The factors were never intended to establish a ceiling or ironclad set of criteria for determining whether a sentence was cruel and unusual under article I, section 17, but rather the general nature of the factors that may point in the direction of finding a sentence so grossly disproportional as to amount to a violation of article I, section 17.
Second, the Bruegger factors are met in this case. Although the Iowa felony-murder statute has been limited in important ways, it is still very broad. Any person who simply participates in a robbery may be found guilty of felony murder, even if that person did not bring a weapon to the scene, had no knowledge that weapons would be present at the scene, and had nothing to do with the murder. Also, Harrison was seventeen at the time of the crime. And, instead of being exposed to the sanction for the crime he clearly was guilty of committing, robbery, which carries a term of years sentence, Harrison was sentenced to life in prison with possibility of parole. There seems little doubt that Harrison's prison sentence under felony murder will be geometrically longer than that which would have resulted if he had been convicted only of robbery.
It is true, of course, that Harrison is eligible for parole. That, of course, might be a mitigating factor, particularly if eligibility for parole is considered soon after he has reached full maturity and correctional authorities have an opportunity to evaluate his rehabilitation. And a meaningful opportunity to be heard must mean more than a paper review but must involve a serious assessment of the maturity and rehabilitation of the defendant. Even so, however, the difference between a sentence of life in prison with a meaningful opportunity to show rehabilitation and maturity after a decade in prison is substantially more severe than a mere conviction for robbery.
I find it unnecessary to reach the question of whether life without parole is categorically unconstitutional under article I, section 17, but I would hold that in this case, a life sentence with the possibility of parole, the harshest sentence available to a child, is grossly disproportional to what he deserves, namely, a sentence for robbery or perhaps involuntary manslaughter.
VI. Conclusion.
For the above reasons, I respectfully dissent.
Wiggins, J., joins this dissent.

Prior to the modern version of the statute, Iowa's felony murder rule was codified at Iowa Code section 690.2 (1977).